RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

BONDEX INTERNATIONAL, INC.; RPM, INC.;
REPUBLIC POWDERED METALS, INC.
(08-4735),
     *Plaintiffs-Appellants/Cross-Appellees,*

v.

HARTFORD ACCIDENT AND INDEMNITY
COMPANY, et al.,
          *Defendants,*

ALLSTATE INSURANCE COMPANY (09-3091);
MT. MCKINLEY INSURANCE COMPANY
(09-3092); CENTURY INDEMNITY COMPANY
(09-3304); CONTINENTAL CASUALTY
COMPANY; COLUMBIA CASUALTY COMPANY
(09-3307),
     *Defendants-Appellees/Cross Appellants.*

> Nos. 08-4735; 09-3091/
> 3092/3304/3307

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-01322—Ann Aldrich, District Judge.

Argued: October 12, 2011

Decided and Filed: November 28, 2011[*]

Before: DAUGHTREY, COOK, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dennis R. Lansdowne, SPANGENBERG SHIBLEY & LIBER LLP,
Cleveland, Ohio, for Plaintiffs. Daniel F. Gourash, SEELEY, SAVIDGE, EBERT &
GOURASH CO., L.P.A., Cleveland, Ohio, Patricia B. Santelle, WHITE AND
WILLIAMS LLP, Philadelphia, Pennsylvania, Andrew T. Frankel, SIMPSON

_____

[*] This decision was originally issued as an "unpublished decision" filed on November 28, 2011.
On January 24, 2012, the court designated the opinion as one recommended for full-text publication.

THACHER & BARTLETT LLP, New York, New York, for Defendants. **ON BRIEF:** Dennis R. Lansdowne, Shelly K. Hillyer, SPANGENBERG SHIBLEY & LIBER LLP, Cleveland, Ohio, Michael E. Brittain, Jeffrey J. Lauderdale, CALFEE, HALTER & GRISWOLD LLP, Cleveland, Ohio, John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Plaintiffs. Daniel F. Gourash, Robert D. Anderle, SEELEY, SAVIDGE, EBERT & GOURASH CO., L.P.A., Cleveland, Ohio, Patricia B. Santelle, Michael E. DiFebbo, Shane R. Heskin, WHITE AND WILLIAMS LLP, Philadelphia, Pennsylvania, Andrew T. Frankel, SIMPSON THACHER & BARTLETT LLP, New York, New York, Robert F. Cossolini, Jeremiah L. O'Leary, FINAZZO, COSSOLINI, O'LEARY, MEOLA & HAGER LLC, Morristown, New Jersey, David M. Rice, CARROLL, BURDICK & McDONOUGH LLP, San Francisco, California, Clifford C. Masch, Holly M. Wilson, REMINGER & REMINGER CO., LPA, Cleveland, Ohio, Howard J. Fishman, ARONBERG GOLDGEHN DAVIS & GARMISA, Chicago, Illinois, Brian T. Winchester, McNEAL, SCHICK, ARCHIBALD & BIRO CO., LPA, Cleveland, Ohio, Michael J. Baughman, COHN, BAUGHMAN & MARTIN, Chicago, Illinois, David J. Fagnilli, DAVIS & YOUNG, Cleveland, Ohio, Andrew T. Hayes, Steven R. Hobson, LEIBY, HANNA & RASNICK, Akron, Ohio, Michael E. Smith, FRANTZ WARD LLP, Cleveland, Ohio, Andrew M. Wargo, BONEZZI SWITZER MURPHY POLITO & HUPP CO. L.P.A., Cleveland, Ohio, for Defendants. Michael J. Hendershot, Richard D. Schuster, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Amicus Curiae.

————————————

**OPINION**

————————————

COOK, Circuit Judge. Plaintiffs-Appellants RPM, Inc. ("RPM") and its two subsidiaries, Bondex International, Inc. ("Bondex") and Republic Powdered Metals, Inc. ("New Republic"), seek coverage from multiple insurance companies, Appellees, for Appellants' settlement and defense costs related to thousands of asbestos-exposure products-liability lawsuits that began in 1981. Many of the underlying asbestos claims allegedly arise from consumers' exposure to products manufactured by The Reardon Company ("Old Reardon"), a corporation that sold its assets and liabilities to RPM (then known as Republic Powdered Metals, Inc.), dissolved, and became a division of RPM's business in 1966. The relevant policies, issued in Ohio for policy periods spanning from

1973–1985,[1] did not expressly identify Old Reardon or its later incarnation as "Named Insureds." Nevertheless, the insurance companies do not dispute that the policies provide coverage for asbestos claims related to the Reardon products (the "Reardon claims"), and each has paid Appellants pursuant to the applicable policies' aggregate limits for "Products Hazard" claims. Collectively, the insurance companies have paid more than $100 million in coverage under the relevant policies. Appellants now seek more than $125 million in additional coverage under the relevant policies, as well as several million dollars in continuing defense costs from Mt. McKinley Insurance Company, arguing that the policies' "Products Hazard" caps do not apply to the Reardon claims.

The district court rejected Appellants' coverage theories and granted summary judgment to the insurance companies, reasoning that the de facto merger doctrine warranted extending the policies' Products Hazard caps to Old Reardon, as RPM's absorbed predecessor. As a result of this ruling, the district court dismissed many of the insurance companies' contingent counterclaims and third-party claims as moot and dismissed certain counterclaims for failure to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).

Although we do not adhere to the district court's de facto merger analysis, we affirm because the policy language and the parties' course of dealing support the district court's judgment.

I.

Old Reardon, a company founded in 1883 and incorporated in Missouri in 1914, manufactured and sold paint and drywall products later discovered to contain asbestos. In March 1966, Republic Powdered Metals, Inc. ("Old Republic") entered into a purchase and assumption agreement ("1966 purchase agreement") whereby it purchased

---

[1]Appellants initially brought claims under policies issued by Hartford Accident and Indemnification Co. that provided coverage from 1967–71. The parties settled those claims prior to the ruling appealed here.

Old Reardon's assets for cash and assumed liability for claims arising from Old Reardon's products. At the same time as the purchase agreement, Old Reardon's shareholders approved a dissolution and liquidation plan. In short order, Old Reardon changed its name to Nodraer ("Reardon" spelled backwards) Liquidating Company, dissolved, and liquidated its assets by the end of the year. Despite the dissolution and liquidation of Old Reardon, Old Republic continued Old Reardon's business as an internal division called the Reardon Division. The Reardon Division continued to operate Old Reardon's manufacturing plants with many of the same Old Reardon employees, brand names, and product formulas. Naturally, the new products had the same latent asbestos problems. Old Republic blurred the distinction between it and Old Reardon by adopting Old Reardon's founding and incorporation dates as its own and advertising its products with Old Reardon's trade names, "Bondex" and "The Reardon Company."

In November 1971, Old Republic changed its name to RPM, Inc., and created two wholly owned subsidiaries called Bondex International, Inc. ("Bondex") and Republic Powdered Metals, Inc. ("New Republic"). The following May, RPM transferred the assets and liabilities of the Reardon Division to Bondex and transferred the assets and liabilities of Old Republic to New Republic, but the asset transfers did not significantly affect RPM's business or product lines.

Beginning in 1981 and continuing through the 2000s, numerous consumers filed suit against Appellants claiming asbestos-related injuries caused by exposure to products manufactured by The Reardon Company, RPM, Bondex, or Republic (collectively "Republic/RPM"). By 2006, more than 32,000 plaintiffs had filed asbestos claims, many of which targeted goods manufactured and sold by Old Reardon (pre-1967) or the Reardon Division of RPM (post-1966). Republic/RPM had insured itself and its subsidiaries against such risks under general coverage liability insurance policies issued by Defendants-Appellees Allstate, Century, Continental, Columbia, and Mt. McKinley, or their predecessors. Some of these insurers provided primary insurance, and others provided excess insurance that kicked in if Appellants exhausted a primary or

subordinate insurance policy. Although the relevant policies varied with regard to some terms, they all provided defense or indemnity coverage to the policies' "Named Insured" or "Insured." The policies also contained Products Hazard caps, which set aggregate limits on the amount of coverage available to insureds for product-liability claims during the applicable policy period. In the absence of the Products Hazard cap or another limitation on coverage, the policies provided for general coverage liability (i.e., unlimited coverage).

The policies define the relevant terms as follows:

**\*  NAMED INSURED:** "Named Insured" means the organization named in the declaration of this policy and includes: (1) any subsidiary company (including subsidiaries thereof) and any other company under their control and active management at the inception date of this policy; (2) new organizations acquired by the Named Insured during the policy period, through consolidation, merger, purchase of the assets of, or assumption of control and active management; provided such acquisition or assumption is reported to INA within sixty days after it is effected and provided further such acquisition is endorsed on this policy.

**\*  NAMED INSURED'S PRODUCTS:** "Named Insured's products" means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof (other than a vehicle) . . . .

**\*  PRODUCTS HAZARD:** "products hazard" includes personal injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the Named Insured after physical possession of such products has been relinquished to others.

As the asbestos claims poured in throughout the 1980s and 1990s, Appellants negotiated settlements between the asbestos plaintiffs and their insurance companies. When all necessary parties agreed to settlement terms, Appellants submitted approved settlements to the insurers, the insurers disbursed settlement checks to Appellants' attorneys up to the limits of the relevant insurance policies, and Appellants' attorneys disbursed settlement funds to the underlying plaintiffs. When a primary or subordinate

insurance company reported to Appellants that they had exhausted their Products Hazard coverage for a particular policy period, Appellants would seek coverage from the next level of excess insurance. Occasionally, Appellants disputed coverage allocation with their primary insurers, but these disputes did not concern whether the Products Hazard caps applied to the Reardon-derived asbestos claims, and Appellants entered into two separate settlement agreements with primary insurers in the 1990s that recognized the "The Reardon Company" and "Reardon Division" as insured parties and stipulated that all asbestos claims—including Old Reardon and Reardon Division claims—would exhaust the primary insurer's aggregate limits. (R. 614, App'x 5822–24 (1993 Bondex Claims Handling Agreement); R. 383, App'x 5894–96 (1995 RPM Bodily Injury Claims Handling Agreement).) After exhausting the last of their insurance policies in or about 2003, Appellants claimed for the first time that they had not exhausted their insurance coverage, because the Products Hazard caps did not apply to the Reardon claims. (*See* Appellants' Br. at 14.)

Appellants filed suit against the insurance companies asserting claims for breach of contract, declaratory judgment, and breach of the duty of good faith and fair dealing. Appellants' First Amended Complaint ostensibly contained an alternative theory for unlimited coverage against Mt. McKinley under the "Contractual Liability" provisions of the policies issued by its predecessor, Gibraltar. (*See* Am. Compl. ¶¶ 108–20.) The insurance companies filed contingent counterclaims and third-party claims sounding in estoppel, exhaustion, and fraud, and seeking contribution. The parties cross-moved for summary judgment.

The district court resolved all cross-motions by final opinion and order of February 10, 2009.[2] Applying Ohio law, the court determined that the 1966 purchase agreement constituted a de facto merger between Old Reardon and Republic/RPM (the absorbing entity), such that the policy term "Named Insured" included Old Reardon and

---

[2]The district court initially resolved the cross-motions for summary judgment by opinion and order of December 1, 2008, and the parties thereafter filed motions for clarification and to amend judgment. The final opinion does not differ materially from the initial opinion.

the Products Hazard caps applied to the Reardon claims. *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03-cv-1322, slip op. at 15 (N.D. Ohio Feb. 10, 2009) (applying "hallmarks" from *Welco Industries, Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1134 (Ohio 1993), to interpret insurance policies). In addition to finding that the caps applied to the Reardon claims, the district court held that Mt. McKinley had exhausted its coverage liabilities, ordered Appellants to return $231,073.33 of overpayments to Mt. McKinley, and found for Mt. McKinley on Appellants' bad faith claim. After resolving Appellants' insurance claims, the district court dismissed the insurance companies' contingent counterclaims and third-party claims. *Id.* at 18–24.

Appellants timely appealed, and the insurance companies filed contingent cross-appeals on behalf of their dismissed claims. Trade organizations have filed *amicus* briefs on both sides.

## II.

The district court had diversity jurisdiction under 28 U.S.C. § 1332, and we have appellate jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all reasonable inferences from the record in the light most favorable to the nonmoving party, and we only grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citation omitted). Appellate courts reviewing summary judgment may affirm on any grounds supported by the record. *E.g.*, *Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762, 767 (6th Cir. 1995).

The district court concluded, and the parties do not dispute, that Ohio law governs these policy disputes. *See United States v. A.C. Strip*, 868 F.2d 181, 184 (6th Cir. 1989) (recognizing that Ohio law applies to policies issued in Ohio). Under Ohio

law, the interpretation of an unambiguous insurance contract presents a question of law that an appellate court reviews de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). The presence of undefined terms in a policy does not convert the issue into a question of fact so as to preclude summary judgment. *Id.*

### III.

The primary coverage dispute presents a narrow interpretive question: Do Old Reardon and the Reardon Division qualify as Named Insureds? If so, then the policies' Products Hazard caps apply to claims arising from their products. Because we find that both Old Reardon and the Reardon Division qualify as Named Insureds under the plain language of the policies, we agree with the district court that the Products Hazard caps apply to the Old Reardon and Reardon Division asbestos claims.

### A. *Plain Language*

Under Ohio law, insurance companies bear the burden of demonstrating that an insurance claim falls within an exclusion to coverage. *E.g.*, *Cont'l Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio 1980); *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 992–93 (6th Cir. 2003). "Our goal when construing [an insurance] policy is to ascertain the intent of the parties." *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999). We review policy terms in the context of the whole policy so as to read the policy terms in harmony. *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997); *see also Stith v. Milwaukee Guardian Ins., Inc.*, 541 N.E.2d 1071, 1072 (Ohio Ct. App. 1988) (explaining that "such construction must be given as will harmonize and give effect to all its provisions, and that no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible."). Where the policy language sets forth the relevant coverages and exclusions in unambiguous terms, we must apply the terms as written, according to their "plain and ordinary meaning." *E.g.*, *Cincinnati Indem. Co. v. Martin*, 710 N.E.2d 677,

679 (Ohio 1999); *Monticello Ins. Co. v. Hale*, 114 F. App'x 198, 201 (6th Cir. 2004). Specialized definitions provided in the policy govern notwithstanding their ordinary meaning, *see, e.g.*, *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450 (6th Cir. 1999), but ambiguous coverage or exclusion terms "will be construed strictly against the insurer and liberally in favor of the insured," *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988); *accord Monticello Ins.*, 114 F. App'x at 201. To establish ambiguity, the insured must provide a reasonable alternative understanding of the relevant policy language, *see Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008), but challenges to the fairness of the policy will not suffice, *Foster Wheeler*, 678 N.E.2d at 526 ("A contract does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.") (internal quotation marks and citation omitted).

The relevant policies do not expressly identify Old Reardon or the Reardon Division as Named Insureds. Appellants suggest that the analysis should end there, but this argument overlooks the policies' specialized definition of "Named Insured," which includes both organizations identified in the policy declarations and "any subsidiary company (including subsidiaries thereof) and *any other company* under their control and active management at the inception date of [the] policy." Appellants' argument also gives short shrift to the term Named Insured's Products, which extends broadly to any "goods or products manufactured, sold, handled *or* distributed by Named Insured or by others trading under his name." In order to give effect to these expansive policy terms, this court must look to their plain and ordinary meaning to ascertain which unidentified parties qualify as Named Insureds, and which goods constitute Named Insured's Products. *See Guman Bros. Farm*, 652 N.E.2d at 686 ("A court must give undefined words used in an insurance contract their plain and ordinary meaning.").

Significantly, the definition of "Named Insured" uses the inclusive phrase "any other company"—which itself expands the field of covered entities beyond the narrower designation "any    subsidiary    company"—rather    than    a    restrictive    term    like "corporation." At the time of the relevant policies' inception, contemporary dictionaries

broadly defined the term "company" to refer to "an association of persons for carrying on a commercial or industrial enterprise." *Webster's New Collegiate Dictionary* 229 (1975 ed.); *Webster's Third New International Dictionary of the English Language Unabridged* 461 (1976 & 1981 eds.); *see also* Merriam-Webster Online, http://www.merriam-webster.com/dictionary/company (definition 3(b) (same)) (last visited Nov. 22, 2011). Nothing in this definition provision, or elsewhere in the relevant policies, suggests that the term "company" only extends to formal business entities, such as corporations, partnerships, or sole proprietorships, and Appellants' counsel conceded as much at oral argument.

With these definitions in mind, we consider the Reardon Division and Old Reardon claims.

### 1. The Reardon Division (Post-1966)

Although Appellants deny that Republic/RPM ever controlled or actively managed Old Reardon, Appellants do not dispute that Republic/RPM controlled and actively managed the Reardon Division that continued Old Reardon's business after its purchase and later dissolution in 1966. The Reardon Division did not have a separate legal existence from Republic/RPM, and the undisputed record reveals that the Reardon Division used the same manufacturing plants, employed the same employees, and made and sold many of the same products under the same brand names as Old Reardon. To the extent the relevant policies even view the Reardon Division as a distinct entity, we have no doubt that the Reardon Division constituted a *company* under the *control* and *active management* of Named Insured Republic/RPM at inception, and thus qualifies as a Named Insured. Nor do we doubt that the products, which Republic/RPM continued to *manufacture* and *sell* through the Reardon Division, qualify as Named Insured's Products. The same conclusion necessarily holds for products manufactured by Old Reardon (pre-1967), but sold, handled, or distributed by the Reardon Division (post-1966). Consequently, the policies' Products Hazard caps apply to the Reardon Division claims.

## 2. *Old Reardon*

The question remains whether the Products Hazard caps apply to claims arising from products manufactured, sold, handled, and distributed by Old Reardon prior to the 1966 purchase agreement and dissolution. We find that the undisputed business continuity between Old Reardon and the Reardon Division justifies application of the caps.

Notably, of the three relevant policy terms—Named Insured, Named Insured's Products, and Products Hazard—only Named Insured includes a specific temporal limitation. By focusing on "the inception date of th[e] policy," the term takes a snapshot of companies under the Named Insured's control and active management at the time the policies took effect. As noted above, the undisputed record reflects that the Reardon Division continued Old Reardon's business—making many of the same paint and drywall products, at the same plants, with the same employees, and then selling these products under the same brand names. Republic/RPM went so far as to adopt Old Reardon's founding and date-of-incorporation as its own in business filings and public releases. Appellants maintain that factual disputes remain, but they show no genuine dispute with regard to the above facts, which demonstrate a continuity of Old Reardon's business. Although Old Reardon lost its cloak of corporate independence after the 1966 purchase agreement and dissolution, the same "association of persons for carrying on a commercial enterprise"—and thus, the same *company* under the plain meaning of that term—continued as a division of Republic/RPM. Because the temporal element of "Named Insured" looks to the date of inception, it does not matter that Republic/RPM did not control Old Reardon prior to the 1966 purchase agreement; it only matters that they controlled and actively managed the company at the onset of the relevant policies, the first of which took effect in 1973.

Appellants focus on Old Reardon's corporate independence prior to 1967 has no application to this insurance dispute, which requires us to apply the plain language of the relevant policies. Nothing in the policy language supports applying the policies'

definition of Named Insured so as to limit coverage for Reardon Division products but provide unlimited coverage for Old Reardon's products. Indeed, as previously noted, Appellants' counsel conceded at oral argument that the definition's use of the broad term "any other company" extended beyond formal corporate entities. *Cf. SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 161 (3d Cir. 1996) (majority narrowly construed indemnification agreement where contract provided a limited definition to the term "business," but noted that a broader definition, or no definition at all, would have changed the outcome).

Despite this concession, Appellants' counsel suggests that a broad interpretation of the term "company" leads to inconsistent usage of that word in sub-definition (2) of the term "Named Insured." But, according to the policy examples provided in the record, that provision does not even use the word "company"; rather, it refers to "new *organizations* acquired by the Named Insured during the policy period, through consolidation, merger, purchase of . . . assets . . . , or assumption of control and active management." We see no inconsistency. From later statements we understand Appellants' counsel to argue that, because sub-definition (2) identified "purchase of assets" as a covered method of acquisition, sub-definition (1) *should* have included this method too. But this logic oversteps the limited contours of Ohio's ambiguity analysis. We may not ponder whether the insurance companies (or we) could have drafted more precise language; we only consider whether Appellants have offered a reasonable alternative interpretation. *Lager*, 896 N.E.2d at 669; *Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996) ("It is axiomatic that this rule [of strict construction against the insurer] cannot be employed to create ambiguity where there is none. It is only when a provision in a policy is susceptible of more than one reasonable interpretation that an ambiguity exists in which the provision must be resolved in favor of the insured.").

Furthermore, Appellants' argument overlooks the different functions of the two sub-definitions. The first focuses on the policies' inception dates and broadly encompasses "any other company under [the Named Insured's] control and active management." The second provision focuses on acquisitions made *during* the

policy period (i.e., after the insurance company has already assumed the risk) and sets reporting requirements for the insured to receive coverage for certain types of acquisitions. Viewed in the context of the entire definition of Named Insured—the designation which triggers Products Hazard caps for Named Insured's Products—sub-definition (1)'s all-encompassing language serves to extend the policies' aggregate limits to covered entities not identified in the other sub-definitions: the Named Insured's formal subsidiaries *and* any other company controlled or actively managed by the Named Insured at inception. Appellants would have us read the definition of Named Insured to create a loophole that does not exist—a once-independent corporation that the Named Insured had long since absorbed at the time of inception, whose liabilities qualify for the Named Insured's coverage, but which receives unlimited coverage, unlike every other covered entity on Named Insured's policy. Given the sub-definitions' different purposes, we see no reason to constrain the broad language of the first provision by reference to the narrow language of the second provision.

*B. Extrinsic Evidence*

Appellants attempt to bolster their ambiguity argument by pointing to insurance industry developments in the 1980s, namely (i) an internal legal memorandum circulated by counsel for a prominent industry association, and (ii) industry changes to the standard policy definition of "Named Insured's Products" to ensure coverage caps for predecessors' products. Under Ohio law, we may consider extrinsic evidence "to interpret, but not to contradict, the express language," *Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 344 (Ohio Ct. App. 1989), and we note that courts have looked to industry practice for guidance on the interpretation of insurance policies, *see, e.g.*, *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 884–85 (Fla. 2007). Yet Appellants' industry developments carry little weight because they occurred at the end of the relevant policies, and they addressed a global policy issue rather than the specific coverage circumstances at issue in this case. The earliest industry developments cited by Appellants occurred in 1981 (legal memo)—coincidentally, the same year of the first underlying asbestos case filed against Appellants—eight years into the relevant policies.

Appellants further acknowledge that the revised definition of named insured's products did not appear in industry standard policy forms until 1986, after the initiation of coverage under the last of the relevant policies.

In any event, the industry practice interests us less in light of the parties' *actual* course of business. Most significantly, Appellants claim that they did not discover that the insurance companies had "misclassified" the Reardon claims as Products Hazard claims until 2003, more than 20 years after the filing of the first asbestos claim. We find this stance regarding "misclassification" difficult to accept, considering that Appellants have long known that the insurers treated the Old Reardon claims as subject to the policies' aggregate limits.

Throughout the 1990s and early 2000s, Appellants submitted their underlying asbestos claims to the insurance companies by priority of insurance, proceeding up the chain of excess insurance each time they exhausted policy coverage under a Products Hazard cap. At the same time, Appellants did not submit Reardon claims to one insurance company, USF&G, whose policy completely excluded Products Hazard claims from coverage. The fact that the insurance companies repeatedly claimed exhaustion of their policies with Reardon claims over this lengthy claims-submission period in the 1990s and early 2000s—which itself occurred long after the end of the relevant policy periods (1973–1985)—should have alerted Appellants that they were not receiving the unlimited coverage they now seek under the policies.

Also telling, Appellants entered into two settlement agreements with their primary insurers in the 1990s that conspicuously treated Old Reardon and the Reardon Division as insureds. These agreements reflected this understanding in both the preamble and the definition of "Insured," and each further stipulated that all "Indemnity Payments"—defined to include "Asbestos-Related Bodily Injury Action[s]" arising from Old Reardon and Reardon Division products—would "impair and may Exhaust the Aggregate Limits of the Policies." Though we do not use these agreements to interpret the meaning of the policies, they do show that, at least as of the early 1990s, Appellants

were aware that the insurers treated the Reardon claims as Products Hazard claims subject to the policies' limits. The aforementioned circumstances suggest that Appellants discovered a new *theory* for unlimited coverage in 2003, rather than a misclassification of their claims.

*C. Alternative Theory of Coverage:  Contractual Liability*

Our resolution of the primary coverage issue requires us to consider Appellants' alternative theory of uncapped coverage against Century and Mt. McKinley under the "contractual liability" provisions of certain insurance policies. Appellants did not identify this theory as a separate cause of action in the Amended Complaint, and the district court did not squarely address these arguments. Finding the record sufficiently developed for our review, we reject this theory of coverage.

Preliminarily, we do not consider this theory of coverage against Century because Appellants forfeited the claim by failing to raise it in any pleadings or at any stage of the proceedings below. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008); *Thomas v. City of Detroit*, 299 F. App'x 473, 476–77 (6th Cir. 2008). Whereas the Amended Complaint presented facts relevant to a contractual liability claim against *Mt. McKinley*, it did not link Century to these factual allegations, and Appellants further failed to respond to Century's treatment of the issue in its motion for summary judgment. Appellants suggested at oral argument that the pleadings' generic references to the misconduct of "all Defendants" encompassed this theory of coverage against Century, but we cannot accept such threadbare allegations as meeting the Federal Rules' notice-pleading standard. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (noting that, while the Federal Rules do not require detailed factual allegations, they "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that the pleadings should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

With regard to Mt. McKinley, we reject the theory on the merits because Appellants fail to substantiate their claim for uncapped coverage under the predecessor's policy ("Gibraltar policy"). Appellants assert contractual liability coverage only under the Gibraltar policy effective from May to December 1983. (*See* Appellants' Br. at 67–68; Appellants' Reply Br. at 88 n.16.) According to Appellants, the Gibraltar policy incorporated unlimited contractual liability coverage from the underlying Cardinal policy via the Gibraltar policy's "broad as primary insurance" provision. The record evidence, however, belies Appellants' assertion that the underlying Cardinal policy provided unlimited contractual liability coverage for Products Hazard claims. While the 1983 Cardinal policy sets no aggregate limits on contractual liability coverage, Appellants fail to explain how this coverage applies to Products Hazard claims under the terms of the policy. We note that the 1981 Cardinal policy—which uses the same standard form as the 1983 Cardinal policy—expressly excludes *all* Products Hazard claims from contractual liability coverage (R. 614, App'x 5759, Exclusion (q)), but the version of the 1983 Cardinal policy included in the record conspicuously lacks the exclusions page (*see* R. 672, App'x 2097). Mt. McKinley noted this oversight in their brief, stating that the 1983 Cardinal policy had the same standard exclusion as the 1981 Cardinal policy, and Appellants did not respond. Under the circumstances, we view Appellants' silence as a concession.

But even if the 1983 Cardinal policy did not expressly exclude Products Hazard claims, we fail to see how the Cardinal policy's contractual liability coverage abrogates the Gibraltar policy's express Products Hazard caps. Mt. McKinley correctly notes that contractual liability coverage generally applies to a third-party's claims against an insured on the basis of a contractual agreement, not an insured's claims against the insurer on the basis of products liability claims. *See, e.g.*, *Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681, 683 (7th Cir. 1977) (explaining that contractual liability coverage only applies where "the party seeking to recover against the insured . . . [is] in a contractual relationship with [the insured]"); *W. Waterway Lumber Co. v. Aetna Ins. Co.*, 545 P.2d 564, 566–67 (Wash. Ct. App. 1976) (declining broad interpretation of

contractual liability provision and noting that "its purpose is to provide coverage in the event the insured is held liable under a 'hold harmless' or 'save harmless' clause"). Similarly, courts have narrowly construed "broad as primary" provisions appearing in excess insurance policies, finding that such provisions only refer to the scope of coverage and, thus, only incorporate the underlying policy's covered risks. *E.g.*, *Dexter Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 3:95cv00702, 1997 WL 289677, at \*4 (D. Conn. Mar. 12, 1997) (concluding that "broad as primary" provision did not overcome excess insurance policy's express limits of liability); *Highlands Ins. Co. v. New England Ins. Co.*, 811 S.W.2d 272, 275 & n.4 (Tex. Ct. App. 1991) (rejecting contention that "broad as primary" provision modified the excess insurance policy's subrogation provisions). Appellants do not respond to these authorities. Because Appellants offer no cogent rationale for disregarding the Gibraltar policy's express Products Hazard caps, we reject their contractual liability theory against Mt. McKinley.

## D.  De Facto Merger

Because we conclude that the policies' plain language resolves these disputes, we need not consider the district court's de facto merger analysis. We note, however, that federalism principles caution against a federal court expanding the de facto merger doctrine—a state-law equitable remedy concerning successor liability—into a general rule of contract interpretation. *See, e.g.*, *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir. 1987) (explaining that federal courts applying state law must do so "in accordance with the then controlling decisions of the highest state court") (citations and internal quotation marks omitted).

## IV.

Appellants also challenge the district court's denial of their bad faith and exhaustion claims against Mt. McKinley. Like Appellants' primary coverage claims, these claims fall flat.

A. *Exhaustion*

Beyond reiterating their primary coverage position, Appellants challenge Mt. McKinley's method of payment and the district court's laches judgment; the laches judgment awarded $231,073.33 in overpayments to Mt. McKinley. Appellants do not deny that Mt. McKinley paid its aggregate limits under the relevant policies—$39 million—into trust accounts managed by Appellants' national coordinating counsel. They nevertheless contend that this indirect form of payment did not satisfy Mt. McKinley's coverage obligations, and therefore that Mt. McKinley remains liable for millions of dollars in continuing defense costs incurred after payment of the aggregate limits. Appellants support their argument with cases where the courts found that an insurer's payment to its own trust accounts or third-party accounts did not satisfy coverage obligations. *See, e.g.*, *Nat'l Cas. Co. v. Ins. Co. of N. Am.*, 230 F. Supp. 617 (N.D. Ohio 1964) (payment to court). Yet these cases do not speak to this case's situation, where the insurance company, with the insured's consent, paid the insurance proceeds to a trust fund managed by the insured's attorney. Appellants' national coordinating counsel's deposition testimony confirms that Mt. McKinley's form of payment complied with the parties' routine claims-submission practice. (*See* R. 608, Bowers Dep. 116–18, App'x 1561–62 (explaining that, once the parties approved a settlement, the insurance companies would send a check to Bowers's firm, his firm would record the check in its trust notebooks, and then his firm would issue a settlement check from the trust account to either local counsel or the underlying plaintiff's attorney).) The record further reflects the absence of objection by Appellants at the time of payment. Appellants provide no justification for their newfound objection to Mt. McKinley's form of payment, and we will not speculate as to one.

With regard to the district court's laches judgment, which concerned Mt. McKinley's indemnification payments for another RPM subsidiary, Appellants do not deny that Mt. McKinley paid $231,073.33 on those claims. Rather, Appellants take issue with the district court's determination that Mt. McKinley overpaid its aggregate limits. Positing that they believed these payments were just settlement contributions and not

coverage, Appellants generally deny that Mt. McKinley presented sufficient evidence to establish a laches defense. But Appellants do not identify any deficiency in Mt. McKinley's showing or the district court's laches analysis. *See State ex rel. Polo v. Cuyahoga Cnty. Bd. of Elections*, 656 N.E.2d 1277, 1279 (Ohio 1995) ("The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party."). Nor do Appellants dispute the relevant facts the district court relied on: that Mt. McKinley sent five separate notices to Appellants more than six years before this lawsuit informing Appellants that these payments counted toward the aggregate limits, and that Appellants never objected to these notices. We find no error in the district court's laches ruling on the basis of these undisputed facts.

## B. Bad Faith

Finally, Appellants attempt to resurrect their bad faith claim against Mt. McKinley as a free-standing claim. Appellants argue that "McKinley committed bad faith by failing, without reasonable justification, to pay a portion of defense costs incurred by Plaintiffs before McKinley allegedly exhausted its Policies that McKinley admitted was due and owing." But the pleadings do not support this breach-before-exhaustion assertion.

The Amended Complaint points to the following conduct for bad faith:

156. On or about February 28, 2003, Mt. McKinley wrongfully claimed that it had exhausted all of its remaining aggregate limits of liability under the Gibraltar Umbrella Policies.

157. Prior to its wrongful claim of exhaustion, Mt. McKinley acknowledged its duty to defend and indemnify RPM, Bondex and New Republic in asbestos bodily injury cases. Mt. McKinley also specifically agreed to pay a portion of all defense counsel fees and other defense costs ("defense costs") incurred by RPM, Bondex and New Republic in asbestos bodily injury cases prior to the date of the alleged exhaustion of the Gibraltar Umbrella Policies.

158. In material breach of its duty to defend and its specific agreement to pay a portion of defense costs incurred by RPM, Bondex and New Republic in asbestos bodily injury cases, Mt. McKinley has wrongfully failed and refused to pay defense costs in excess of $350,000. . . .

Fairly read, the Amended Complaint fails to allege sufficient factual matter to assert a plausible claim that Mt. McKinley breached some agreement *other than* the relevant insurance policies. *See Iqbal*, 129 S. Ct. at 1949–50; *Twombly*, 550 U.S. at 555–63. Presented with these pleadings, the district court properly treated the bad faith claim as a contingent claim that fell with Appellants' primary coverage claims. If Mt. McKinley exhausted its coverage obligations in February 2003, it did not owe anything more to Appellants under the relevant insurance policies, and its denial of coverage cannot constitute bad faith. *See O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 501 (5th Cir. 1985) (noting that the insured's bad faith claim depended on the outcome of the coverage claim).

Appellants attempt to flesh out the bad faith claim in their reply brief by pointing to a May 13, 2003 fax sent by Mt. McKinley's claims manager, arguing that it shows that Mt. McKinley threatened to discontinue paying defense costs before Mt. McKinley exhausted its coverage. We do not consider this argument raised for the first time in a reply brief. *See, e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). Even if properly raised, the fax adds nothing to Appellants' argument; it does nothing more than state Mt. McKinley's position that it had already exhausted its coverage by notice of February 2003. Appellants also object to the district court's sua sponte denial of this claim, after previously having stayed discovery. But, because Appellants articulate no distinct factual basis for bad faith, we agree with the district court that the primary coverage claims subsume the bad faith claim. Federal Rule of Civil Procedure 56(f) permits a court to grant judgment to a nonmovant, or on grounds not raised by the parties, if it first "giv[es] notice and a reasonable time to respond." Although it appears that the district court did not provide notice before issuing the initial ruling in December 2008, Appellants had notice and an opportunity to respond to that ruling in its later motion for clarification and to amend judgment, which prompted the final opinion and

order of February 2009. Furthermore, even if the district court failed to provide sufficient notice before the sua sponte ruling, Appellants' argument fails in the absence of a showing of prejudice. *See, e.g.*, *Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 380 (6th Cir. 2011); *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984). Under such circumstances, we need not engage in "an empty formality." *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 960 (6th Cir. 2007).

## V.

For these reasons, we AFFIRM the district court's judgment on all counts. We DISMISS as MOOT the insurance companies' contingent cross-appeals.