RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TEXTILEATHER CORPORATION,

                    *Plaintiff-Appellant,*

      *v.*

GENCORP INC.,

                 *Defendant-Appellee.*

No. 10-3634

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 08-00171—Jack Zouhary, District Judge.

Argued: March 2, 2012

Decided and Filed: September 11, 2012

Before: SILER, ROGERS, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Louis E. Tosi, SHUMAKER, LOOP & KENDRICK, LLP, Toledo, Ohio, for Appellant. Robert S. Walker, JONES DAY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Louis E. Tosi, Joseph S. Simpson, SHUMAKER, LOOP & KENDRICK, LLP, Toledo, Ohio, Michael J. O'Callaghan, SHUMAKER, LOOP & KENDRICK, LLP, Columbus, Ohio, for Appellant. Robert S. Walker, Matthew P. Silversten, JONES DAY, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

SILER, Circuit Judge. Textileather Corporation, which purchased a vinyl-manufacturing facility with hazardous waste management units ("RCRA units") from GenCorp Inc., appeals from the district court's grant of summary judgment to GenCorp in this breach-of-contract and Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") action. We **AFFIRM IN PART**, **REVERSE IN PART**,

1

and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I.

GenCorp owned and operated a vinyl-manufacturing facility from the mid-1950s to 1990, including the operation of several RCRA units, which reclaimed solvent waste. Under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, GenCorp was obligated to obtain permits to operate these units.

In 1989, GenCorp entered into negotiations to sell the vinyl-manufacturing facility to Textileather. In order to address allocation of each side's liabilities, the parties jointly hired an environmental consulting firm. GenCorp applied for, but had not received, all of the required RCRA permits at the time of its agreement with Textileather.

The negotiations culminated in an Asset Purchase Agreement ("APA"), which specified, in relevant part, GenCorp's retained liabilities, and contained a provision requiring each party to indemnify and defend against their retained liabilities. Section 9.1.1 of the APA, titled "Retained Liabilities," provides the following:

Seller will retain responsibility for:

(a) all liabilities, if any, to third persons in respect of the substances, conditions and other matters which are included on the Chemicals List in Section 9.1.6, . . . whenever such liabilities may arise, and by whatever third persons may assert such liabilities, specifically including (A) fines, penalties, judgments, awards, settlements, losses, damages, costs, fees (including attorneys' and consultants' fees), expenses and disbursements, (B) defense and other responses to any administrative or judicial action (including claims, notice letters, complaints and other assertions of liability) instituted by any third person concerning any such liability, and (C) financial responsibility for (i) cleanup costs and injunctive relief, including any removal, remedial or other response actions, and natural resource damages, and (ii) any other compliance or remedial measures. . . . and

(b) all liabilities, if any, to third persons (including the types of liabilities identified in (a)(A)-(C) above) in respect of any substance,

condition or other matter related to the off-site management (including handling, storage, treatment, recycling, transportation or disposal) of any material after June 14, 1954 and prior to the Closing at any off-site property.

Section 9.1.4, titled "Indemnification," provides the following:

Seller will indemnify and defend Purchaser with respect to the liabilities retained by Seller as provided in Sections 9.1.1 and 9.1.2 above; provided that Purchaser promptly gives Seller notice of any claims or actions, transmits to Seller copies of all documents and papers received by or served on Purchaser in connection therewith, permits Seller to control the defense thereof, and (at its own expense) fully cooperates with Seller in the defense thereof. Purchaser will indemnify and defend Seller with respect to the liabilities assumed by Purchaser as provided in 9.1.3 above; provided that Seller promptly gives Purchaser notice of any claims or actions, transmits to Seller copies of all documents and papers received by or served on Seller in connection therewith, permits Purchaser to control the defense thereof, and (at its own expense) fully cooperates with Purchaser in the defense thereof.

The parties entered the APA on May 30, 1990, and Textileather became the owner of the vinyl-manufacturing facility on June 4, 1990.

Six months after the purchase, Textileather decided to discontinue use of the RCRA units. Textileather began the closure process required by Ohio Administrative Code § 3745-66. However, during Textileather's efforts to close the RCRA units, the Ohio Environmental Protection Agency ("OEPA") issued several Notices of Deficiency. These notices led to an extended period of negotiations between OEPA and Textileather. The Notices of Deficiency required Textileather to complete a detailed soil-sampling analysis, as well as follow OEPA-developed, site-specific clean-up standards and implement a ground-water-monitoring program. For a more detailed account of the interactions between Textileather and OEPA, see *Textileather v. Korleski*, Nos. 06AP-955, 06AP-956, 2007 WL 2306968 (Ohio Ct. App. Aug. 14, 2007).

In 2001, OEPA approved a closure plan submitted by Textileather. In its letter regarding the approved closure plan, OEPA noted that compliance with this approved plan was expected and would be monitored. Textileather appealed portions of the

approved plan.  The Ohio Tenth District Court of Appeals affirmed the plan in part and reversed in part with instructions to OEPA to approve a plan consistent with its holding. OEPA has not yet issued a new plan.  Throughout the course of the RCRA closure proceedings, including the negotiation of various plans and appeal of the approved plan, Textileather notified GenCorp that it believed, pursuant to the APA, GenCorp was obligated to indemnify and defend Textileather in these proceedings.

Textileather brought this action to recover the costs it incurred in the RCRA closure proceedings.  Textileather and GenCorp filed cross-motions for summary judgment, and the district court granted GenCorp's motion and denied Textileather's motion.  In particular, the district court held the APA to be unambiguous and determined that, under the terms of the APA, OEPA did not constitute a "third party" and Textileather's RCRA closure proceedings with OEPA did not constitute a "claim or action."

## II.

We review a grant of summary judgment *de novo,* construing the evidence and drawing all reasonable inferences in favor of the nonmoving party.  *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

### A.  Breach of Contract Claim

Textileather agues that the district court erred in its interpretation of the APA because that agreement requires GenCorp to defend and indemnify Textileather for the RCRA closure proceedings.  We agree that, under the APA, GenCorp bears responsibility.

Per the terms of the APA, Ohio law governs the dispute.  Under this law, contract interpretation is a question of law for determination by the court.  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008); *Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004).  Ohio courts examine contracts in order to determine the intent of the parties, which is presumed to reside in the language of the agreement.  *Savedoff*, 524 F.3d at 763.  We must apply the plain language of the contract unless that language

is ambiguous. *Id.* "[C]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results[] or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978), *superseded by statute on other grounds*). "[A] writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Id.*

1. Third Person

We begin by addressing whether OEPA is a "third person." Section 9.1.1 of the APA defines GenCorp's retained liabilities as limited to those owed to "third persons." The district court reasoned that "the parties cannot provide, nor has the Court found, any case holding that a regulatory obligation incurred by a party's own business decision is the same as a third-party claim or action." In considering this issue, the district court explained that OEPA could act as a third party if "OEPA demands Textileather clean-up, but Textileather refuses, and . . . OEPA then hires a contractor to come in and do the clean-up. In this situation, . . . OEPA would be a 'third person' contemplated by the APA who may attempt to sue Textileather to recover its costs." Because Textileather complied with OEPA's orders instead of disregarding them, the district court found only first-party regulatory obligations in this case, which it did not view as covered by the APA.

We interpret the phrase "third person" differently. To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries. *See, e.g.*, *United Ohio Ins. Co. v. Brooks*, No. 12-11-04, 2012 WL 1099821, at *4 (Ohio Ct. App. Apr. 2, 2012) (slip copy) (citing Merriam Webster's Collegiate Dictionary and Black's Law Dictionary); *Ohio Valley Associated Builders & Contractors v. Rapier Elec., Inc.*, 947 N.E.2d 1261, 1265 (Ohio Ct. App. 2011). The APA does not define the phrase "third person," but it is commonly understood to refer to a person or entity who is not a party to an interaction or

agreement.  *See, e.g.*, Oxford English Dictionary (2002) ("[a]dditional to and distinct from two others already known or mentioned"); Webster's Third New International Dictionary (2002) ("someone or something that is neither the speaker or writer of the utterance in which they occur nor the one to whom that utterance is addressed"); The Random House College Dictionary (1980) ("anything or anyone other than himself or the one or ones to whom he is speaking").  OEPA was not a party to the APA, so it fairly falls under the common meaning of "third person."

The remainder of the APA presents further evidence that OEPA should be considered a "third person."  Section 9.1.1 provides examples of the types of third-party liabilities retained by GenCorp, and those include fines, penalties, responses to administrative actions, and financial responsibility for compliance and remedial measures.  The examples reflect various forms of liability that governmental agencies, such as OEPA, could require Textileather to incur.  Thus, the phrase "third person" must be broad enough to cover entities to whom the aforementioned examples of liability could be owed because the use of these examples illustrates that the parties intended the coverage of Section 9.1.1 to include them.

Additionally, *Anderson Development Co. v. Travelers Indemnity Co.*, 49 F.3d 1128 (6th Cir. 1995), is instructive.  In that case, a panel of this court explained that, under Michigan law, existing environmental nuisances constitute third-party liabilities.  The EPA warned the plaintiff that failure to comply with potentially responsible party (PRP) notices would result in the plaintiff's being liable for all costs associated with removal or remedial action and all other necessary costs incurred in cleaning up the location.  *Id.* at 1130.  Subsequently, the EPA determined that a clean-up would be required.  *Id.*  The plaintiff cooperated voluntarily.  *Id.* at 1134.  The plaintiff had a liability insurance policy and notified its insurer of this claim, but the insurer refused to defend or cover the matter.  *Id.*  at 1130.  The plaintiff then filed suit against its insurer, seeking a declaration that its liability insurance policies covered all the costs of defense and indemnification resulting from the EPA negotiations and environmental clean-up. *Id.*  The district court granted the defendant's motion for summary judgment because it

found that the letter and consent decree were not a lawsuit and that environmental clean-up costs were not damages. *Id.* On appeal, we held that when the EPA mandated a clean-up, it constituted a third-party liability. *Id.* at 1134.

GenCorp's efforts to distinguish *Anderson* are not persuasive. First, under Ohio law, GenCorp stepped into the position of an insurer to the extent provided for in the indemnity provision. *See Allen v. Standard Oil Co.*, 443 N.E.2d 497, 499-500 (Ohio 1982) (involving an analogous indemnity provision). Thus, the fact that *Anderson* arises in the insurance context has no substantive import. Second, Ohio courts consider PRP notices to be claims of liability. *See Prof'l Rental, Inc. v. Shelby Ins. Co.*, 599 N.E.2d 423, 430 (Ohio Ct. App. 1991). For reasons detailed in the next section, this determination brings PRP notices under the APA.

*Anderson* substantiates our conclusion that OEPA is a third party in this case. In both the case at bar and *Anderson*, a government agency demanded clean-up. In both cases, the plaintiff sought indemnification based upon a prior contract. Unlike the hypothetical situation suggested by the district court, neither plaintiff refused to comply with the government agency; instead, each plaintiff chose to comply voluntarily. In *Anderson*, the voluntary nature of the compliance did not change the EPA's status as a third party relative to the contract to indemnify and defend. 49 F.3d at 1134 ("Thus . . . there was indeed liability to a third party–the EPA."). Similarly, Textileather's compliance does not change OEPA's status in this case. The contract's use of the term "third person" unambiguously includes administrative agencies, such as OEPA.

2. Demands for Liability

Next, the OEPA closure proceedings constitute demands for liability addressed by the APA. The first sentence of Section 9.1.4, the only sentence which discusses GenCorp's indemnity responsibilities, contains two clauses separated by a semicolon. The first clause explains the liabilities for which GenCorp is obligated to indemnify and defend. The second clause describes notice and filing requirements that Textileather must meet in order for GenCorp to defend it. The clause explaining GenCorp's

obligation to indemnify defines that obligation by reference to Sections 9.1.1 and 9.1.2.[1] The phrase "claims or actions" only appears in the subsequent clause which describes the notice and filing requirements. Based on this structure, the phrase "claims or actions" is best understood to refer back to the liabilities described in the previous clause.

But the term "liability" is not defined in the APA. However, liability is commonly understood to mean a monetary obligation, "something disadvantageous," or "the state or quality of being liable." The Random House Dictionary (2012); *see* The American Heritage New Dictionary of Cultural Literacy (2005) ("[a]n obligation or debt"); Oxford English Dictionary (1989) ("[t]he condition of being liable or answerable by law or equity"). The final closure plan required Textileather to perform various investigations and clean-ups. These measures and their inherent costs to Textileather constitute something disadvantageous. Furthermore, the letter that OEPA wrote to Textileather, which was attached to the approved closure plan, illustrates that Textileather was legally responsible for compliance. In that letter, OEPA states:

> [c]ompliance with the approved closure plan . . . is expected. Ohio EPA will monitor such compliance. The director expressly reserves the right to take action . . . to enforce such compliance and to seek appropriate remedies in the event of noncompliance with the provisions and modifications of this approved closure plan. . . . You are hereby notified that this action of the director of the Environmental Protection Agency is final and may be appealed to the Environmental Review Appeals Commission pursuant to Ohio Revised Code Section 3745.04.

The plain language of the letter illustrates that OEPA considers this approval to be an administrative action requiring compliance. Further, the fact that Textileather appealed the closure plan demonstrates that the closure plan's demands for liability were subject to impartial oversight. Because the closure plan required Textileather to take certain actions and thereby incur certain monetary obligations, it is appropriately considered a demand for liability.

---

[1] Section 9.1.1 applies to chemicals on the Chemicals List in Section 9.1.6, and there is no dispute that some of the chemicals at issue in the closure proceedings are included on the Chemicals List.

The Notices of Deficiency are also liabilities covered by the APA. Notices of Deficiency permit the director of OEPA to require a party to take certain actions. Ohio Admin. Code § 3745-66-12(D)(4) (explaining that "[i]f the director does not approve the plan he will provide the owner or operator with a detailed written statement of reasons for the refusal and the owner or operator must modify the plan or submit a new plan for approval within thirty days after receiving such written statement"). In this case, the Notices of Deficiency required that, among other things, Textileather provide OEPA with a detailed soil sampling analysis, follow OEPA-developed site-specific clean-up standards, and implement a ground-water-monitoring program. Requiring Textileather take these actions necessarily imposed monetary obligations on Textileather. Thus, it is reasonable to consider these notices as demands for liability.

Both of these demands are backed by OEPA's legal authority. The director of OEPA has the authority to issue Notices of Deficiency and to approve closure plans under Ohio Administrative Code §§ 3745-66-11, 3745-66-12. Both of these rules were promulgated pursuant to the authority granted to the director of the OEPA by Ohio Revised Code Annotated § 3734.12. *See* Ohio Admin. Code §§ 3745-66-11, 3745-66-12. Under Ohio Revised Code Annotated § 3734.13, the director of OEPA can request that the Attorney General for the State of Ohio institute a civil action to enforce a violation of Section 3734 or a violation of the rules adopted pursuant to the authority given to the director in that chapter. Failure to comply with a closure plan can lead to injunctive relief and civil penalties. *E.g., State ex rel. Petro v. Mercomp, Inc.*, 853 N.E.2d 1193, 1201-02 (Ohio Ct. App. 2006) (affirming a Court of Common Pleas grant of summary judgment to the State of Ohio for claims that the defendant failed to comply with an approved closure plan). Because the orders are backed by legal authority, they are demands for liability.

Construing demands for clean-up as a demand for liability is supported by Ohio case law. *Prof'l Rental, Inc.*, 599 N.E.2d at 427, provides insight into how Ohio Courts would evaluate the communications at issue in this case. The court considered whether a PRP notice imposes liability and determined that the PRP notice was not a lawsuit

because it did not impose liability. *Id.* at 429-30. Rather, PRP notices require a further step to impose liability. *Id.* However, the court found these notices to be a "claim" of liability and demand for restitution because, unlike lawsuits, PRP notifications do not compel clean-up. Thus, under Ohio law, the distinction between demanding and enforcing a liability is whether a party is compelled to resolve it. Because of the director's ability to enforce Notices of Deficiency and approve closure plans with one additional step, Ohio courts could reasonably consider these letters to be demands for liability.

The notices in this case are also covered by Section 9.1.1 of the APA. The list of examples of GenCorp's retained liability in Section 9.1.1(a) demonstrates that the parties intended the term "liability" to be used broadly. The parties specifically stated that GenCorp retained responsibility for "other responses to any administrative or judicial action (including claims, notice letters, complaints and other assertions of liability) instituted by any third person concerning any such liability." The parenthetical illustrates the breadth of the assertions of liability that the parties intended to include in this contract. Because all of Textileather's actions were taken in response to either notice letters or other assertions of liability expressly stated in the APA, the unambiguous interpretation of the APA is that its indemnity provisions included the costs associated with these responses. Therefore, the costs at issue in this case were unambiguously based on a third person's demand for liability and are covered by the plain language of Section 9.1.1.

Last, GenCorp claims that this case should be dismissed under Section 9.1.1(a)(2)(B), which provides:

> [GenCorp] will have no responsibility or obligation in respect of: . . . (2) any substance, condition or other matter included on the Chemicals List in respect of which an action is first asserted after [the deal closed], to the extent that such action: . . . (b) is asserted directly because of actions taken by [Textileather] or its employees, except actions (including the filing of any report or document) that [Textileather] is legally obligated to take.

GenCorp argues that OEPA's orders should be considered "asserted directly because of actions taken by" Textileather, and, therefore, liability for them was not retained by GenCorp. Textileather responds, and we agree, that the liabilities at issue fall within the exception to the exception. Under Section 9.1.1(2)(b) any action that Textileather is legally obligated to take is excluded from this exception. Upon receipt of the final volume of hazardous waste, Textileather was under a legal obligation to close the RCRA units pursuant to an OEPA-approved closure plan. Ohio Admin. Code § 3745-66-13. In order to secure an approved closure plan, Textileather drafted several closure plans. OEPA issued various Notices of Deficiency until finally agreeing to the approved closure plan. Textileather's actions in response to the Notices of Deficiency and the approved closure plan were legally required by OEPA. Thus, the liabilities at issue stem from actions Textileather was legally obligated to take.

For the foregoing reasons, as to this claim, we reverse the district court's decision granting summary judgment to GenCorp and instruct the district court to enter summary judgment in favor of Textileather on the legal question of whether the retained liabilities section applies. We remand this case to the district court for proceedings to determine the appropriate allocation of costs and damages under the terms of that provision.

**B.  CERCLA Claim**

Textileather argues that the district court erred in finding that the contract's language was broad enough to include CERCLA liability. Parties may allocate CERCLA liabilities in their contract. *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 409 (6th Cir. 1999) (citation omitted). Even when a contract was written prior to the passage of CERCLA, we have found that contracts which used sufficiently broad language could transfer CERCLA liability. *Id.* In *White*, we noted that Ohio law did not address whether a contract written before CERCLA was enacted could transfer CERCLA liability. *Id.* at 409-10. After examining other circuit court precedent, we found that a contract allocates CERCLA liability when "it is either specific enough to include CERCLA liability or general enough to include any and all environmental liability." *Id.* at 410 (collecting cases). At the time of this decision, no

Ohio state court has decided what language is required to allocate CERCLA responsibility, and we believe that Ohio courts would be persuaded that the language required by *White* is sufficient to transfer CERCLA liability.

We affirm the district court's decision on this issue on that basis. The APA provides that "[Textileather] will assume [GenCorp's] liabilities in respect of any substance or environmental conditions relating to the Business except those retained by [GenCorp] provided in Sections 9.1.1 and 9.1.2." But Section 9.1.1 is expressly limited to liabilities to third persons. By the plain language of this provision, the APA allocates all environmental liabilities, including CERCLA liability.

Textileather argues that the district court is mistaken in its interpretation. It claims that it only assumed liabilities relating to the "Business." "Business" is a defined term in the APA: "manufacturing automotive soft interior and other products." Textileather adds the phrase "conducted as of May 30, 1990" to that definition. However, Textileather does not provide a citation for this additional phrase.

There are two reasons why this argument is not persuasive. First, because it is unclear where the "May 30, 1990" addition came from, there is no reason to assume that it was the intent of both parties to define the term "Business" as only including the events occurring after that date. Second, reading the APA as a whole provides further support that all environmental liabilities, except those in Section 9.1.1, were assigned. Unlike Sections 9.1.1(a), 9.1.2, and 9.1.3, Section 9.1.1(b) makes an explicit reference to the time frame of GenCorp's ownership. Had the parties intended to limit Section 9.1.3 as Textileather contends, it is reasonable to expect similar language to appear in Section 9.1.3. For these reasons, Textileather's first argument is not persuasive.

Additionally, Textileather argues that we should look to other circuits and district courts in order to hold that the contract does not allocate CERCLA liability. Textileather cites various cases which involve a more limited transfer of liability and where the court did not find that CERCLA liability was transferred. *E.g., PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998) (holding that due to the existence of a provision which limited the hold-harmless provision, the contract did not extinguish CERCLA

claims); *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 216-19 (3d Cir. 1994) (construing a more limited provision).  Due to our holding in *White* and the broad and unambiguous allocation of environmental liabilities in the APA, these cases do not justify overturning the district court judgment.  Therefore, the district court properly concluded that the allocation and assumption of liability provisions apply to CERCLA claims as well. GenCorp retained only those CERCLA liabilities covered by Sections 9.1.1 and 9.1.2.

## III.

For the foregoing reasons, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** the case to the district court for further proceedings consistent with this opinion.