NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0143n.06

No. 21-3467

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ALISHA DEPASQUALE, et al., | ) | **FILED** |
|  | ) | Apr 05, 2022 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| NATIONWIDE MUTUAL INSURANCE | ) | THE SOUTHERN DISTRICT OF |
| COMPANY, | ) | OHIO |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) |  |

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

SILER, Circuit Judge. Plaintiffs Alisha DePasquale and Trayton Cox appeal the district court's order granting Nationwide Mutual Insurance Company's ("Nationwide") Rule 12(b)(6) motion to dismiss. For the following reasons we **AFFIRM**.

## I.

In January 2020, Plaintiffs purchased a trip to Los Cabos, Mexico and insured the vacation with Nationwide (the "Policy"). Plaintiffs were scheduled to fly from their residence in Portland, Oregon on April 3, 2020, and return on April 7, 2020. But in late January, the first case of COVID-19 was confirmed in the United States, and by late February, Oregon reported its first case. By early March, the World Health Organization declared COVID-19 a worldwide pandemic, and the President of the United States declared the pandemic a national emergency. The federal Centers for Disease Control recommended Americans stay home and avoid gatherings of more than ten people, warning that congregate environments increased exposure to COVID-19, and the President

recommended Americans avoid all discretionary travel (collectively the "Federal Advisories"). At the same time, the Governor of Oregon declared a state of emergency. In late March, the Governor issued an executive order to address the pandemic, colloquially called a "stay-at-home order." The stay-at-home order directed residents to, among other things, stay home to the "maximum extent possible," and incorporated Or. Rev. Stat. § 401.990, which imposed criminal fines and imprisonment for failing to comply. *See* O. Rev. Stat. §§ 401.990, 161.615, 161.635.

In response to this changing landscape, Plaintiffs contacted their travel agency to cancel their vacation and requested Nationwide process their claim for reimbursement. Nationwide is obligated under the Policy to extend coverage if Plaintiffs were "prevented" from taking the trip for several reasons; pertinent here are the following perils:

> You or a Traveling Companion being hijacked, quarantined, required to serve on a jury, subpoenaed, the victim of felonious assault within 10 days of departure; or having Your principal place of residence made uninhabitable by fire, flood or other natural disaster; or burglary of Your principal place of residence within 30 days of departure . . . .

Plaintiffs claimed they were prevented from taking their vacation because they were "quarantined" under both the Federal Advisories and stay-at-home order. The Policy, however, does not define quarantine. Nonetheless, Nationwide requested Plaintiffs provide proof that they were quarantined and advised: "[p]lease note that stay at home orders [are] not considered a quarantine under this plan." The claims administrator requested documentation that showed a "physician or other government agency asked you specifically to quarantine[,]" and explained that "a stay at home order issued from a governor is not a quarantine as it is not specific to you or your Traveling Companion." Plaintiffs maintained the Federal Advisories and stay-at-home order prevented them from taking their trip, but Nationwide eventually denied their claim.

Plaintiffs sued Nationwide, individually and on behalf of a purported class, requesting a declaratory judgment and damages for breach of contract. Plaintiffs argued the term quarantine was ambiguous and should be construed in their favor. Nationwide moved to dismiss and strike the class allegations. After considering numerous dictionary definitions of "quarantine," and Oregon's public-health statutes, the district court rejected Plaintiffs' argument and held the term unambiguously required "imposed isolation," which it held was lacking in the Federal Advisories and stay-at-home order. The district court dismissed with prejudice Plaintiffs' breach of contract claim and denied as moot Nationwide's motion to strike class allegations.

## II.

We review the grant of a motion to dismiss de novo and may "affirm the district court's dismissal of a plaintiff's claims on any grounds, including grounds not relied upon by the district court." *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). We review the district court's interpretation of an insurance policy de novo in accordance with state law. *Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, 667 F.3d 669, 676 (6th Cir. 2011).

## III.

On appeal, Plaintiffs argue the district court should have found the term "quarantine" ambiguous, because the word is susceptible to a "narrow" reading and a "broad" reading. Under the "narrow" reading, proposed by Nationwide, quarantine is "imposed isolation." Under the "broad" reading, proposed by Plaintiffs, quarantine is *also* "any government-imposed restriction intended to prevent the spread of disease." Plaintiffs claim that although both readings were plausible, the district court merely accepted Nationwide's as the most persuasive and failed to construe the term in their favor. Under their "broad" reading, Plaintiffs maintain that because the

Federal Advisories and stay-at-home order restrained them from flying to Mexico to limit the spread of COVID-19, they were prevented from taking their trip by "being . . . quarantined."

To begin, we must choose which state law to apply. "In a diversity action involving an insurance contract, a federal court applies the substantive law of the forum state"—here, Ohio. *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The parties agree the outcome is the same under both Oregon and Ohio law, and, therefore, we will apply Ohio law. *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006).

Under Ohio law, insurance contracts are treated like any other written contract. *See Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 597 N.E.2d 1096, 1102 (Ohio 1992). "[T]he interpretation of an insurance contract is a question of law." *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 310 (6th Cir. 2010) (citing *Leber v. Smith*, 639 N.E.2d 1159, 1163 (1994)). The court's role is to "give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1256 (Ohio 2003) (citations omitted). A court must "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy" and rely on "the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Id.* (citations omitted). The court may only abandon the ordinary meaning of a word when absurdity would ensue or when the parties clearly intended some other meaning. *See Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292–93 (Ohio 2011) (citation omitted).

When the language of a contract is unambiguous, "a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "[L]anguage is unambiguous if, from reading only the four corners of the instrument, the language is clear,

definite, and subject to only one interpretation." *Beverly v. Parilla*, 848 N.E.2d 881, 886 (Ohio Ct. App. 7th Dist. 2006). Conversely, "[t]he language is ambiguous if it is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning." *Id.* We declare a term ambiguous "only after our interpretive tools reveal no 'definite legal meaning.'" *Dakota Girls, LLC v. Phila. Indem. Ins. Co.*, 17 F.4th 645, 652 (6th Cir. 2021) (citation omitted) (applying Ohio law).

To establish an ambiguity, "the insured must provide a reasonable alternative understanding of the relevant policy language[.]" *Bondex Int'l, Inc.*, 667 F.3d at 677. "[I]n order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001) (quotation marks and citation omitted). "If the policy is ambiguous, and the insured's interpretation is reasonable, the insured prevails." *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020). But if we find that the contract's language has one unambiguous meaning, we may "properly grant a motion to dismiss a breach-of-contract claim." *Wilkerson v. Am. Fam. Ins. Co.*, 997 F.3d 666, 672 (6th Cir. 2021).

Plaintiffs initially attempt to establish an ambiguity by faulting Nationwide for not defining quarantine within the Policy. But failure to define a term does not, alone, create an ambiguity. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 687 (Ohio 1995). And while Plaintiffs may be able to diagram "quarantine" into two "readings," a term is not ambiguous simply because there are "multiple readings." *See State v. Porterfield*, 829 N.E.2d 690, 692 (Ohio 2005). In this same vein, Plaintiffs note that Nationwide could have included an exclusion for "epidemics," "pandemics," or "public travel restrictions imposed to combat the spread of disease."

But Plaintiffs put the cart before the horse. *Cf. Ohio Valley Livestock Corp. v. Val Decker Packing Co.*, No. 81CA63, 1982 WL 3763, at *6 (Ohio Ct. App. 2nd Dist. July 21, 1982) ("Exclusions do not <u>create</u> coverage; they <u>exclude</u> coverage." (citation omitted)). The lack of an exclusion merely indicates that Plaintiffs would remain covered if they were quarantined—however that term is defined—even if the "quarantine" was ordered for any of those reasons.

Plaintiffs also argue the district court's reliance on Oregon's public health definition of quarantine as "physical separation and confinement of a person," Or. Rev. Stat. § 433.001, was unreasonable because statutory definitions control only statutes and do not reveal the ordinary meaning of a policy term. The district court merely noted that Oregon's public-health statute "supported" its decision, and the holding stands without this authority. Nationwide, however, still believes statutory and regulatory definitions are "the most obvious and natural place to look . . . ." But "absent some special circumstance," like a "commercial or technical meaning acquired by usage and intended to be used by the parties," we must construe the Policy "in a fashion which accords words and phrases . . . their natural and usual meaning." *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1351 (Ohio 1982). As a point of reference, the Oxford English Dictionary's frequency measure characterizes "quarantine" as "distinctively educated, while not being abstruse, technical, or jargon . . . ." *quarantine, n.*, OED, https://www.oed.com/view/Entry/155959?rskey=ZmA9R1&result=1&isAdvanced=false#eid (last visited Dec. 13, 2021) (characterizing quarantine's frequency of use within society as a "Band 5"); *see also Key to frequency*, OED, https://public.oed.com/how-to-use-the-oed/key-to-frequency/ (last visited Dec. 13, 2021) (defining "Band 5" as "distinctively educated, while not being abstruse, technical, or jargon . . . ."). Similarly, Dictionary.com considers the word's complexity to be at a "Middle School Level." *quarantine*, DICTIONARY.COM, https://www.dictionary.com/browse/quarantine

(last visited Dec. 13, 2021). It is unlikely that an ordinary person would have developed his understanding of quarantine based on the vicissitudes of statutory and regulatory definitions. Contrary to Nationwide's argument, whether government authorities intended their orders or advisories to impose a quarantine—as *they* defined it—tells us little about the meaning of the word in this policy.

Instead, "[t]o ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012).

Merriam-Webster's Dictionary ("Webster's") definition of "quarantine" includes:

1: a period of 40 days

2 a: a term during which a ship arriving in port and suspected of carrying contagious disease is held in isolation from the shore . . .

3a: a restraint upon the activities or communication of persons or the transport of goods designed to prevent the spread of disease or pests . . .

4: a state of enforced isolation

*quarantine*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ quarantine?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Dec. 13, 2021). Webster's also defines the transitive verb "quarantined" as "1: to detain in or exclude by quarantine 2: to isolate from normal relations or communication." *Id.*

Black's Law Dictionary defines "quarantine" as: "The isolation of a person . . . afflicted with a communicable disease or the prevention of such a person . . . from coming into a particular area, the purpose being to prevent the spread of disease. The period of time when a person . . . is isolated from others." *Quarantine*, BLACK'S LAW DICTIONARY (11th ed. 2019). The historical understanding of the term is a "regulation by which all communication with individuals, ships, or

goods, arriving from places infected with the plague, or other contagious disease, or supposed to be peculiarly liable to such infection, is interdicted for a certain definite period." *Id.*

Quarantine, as it is defined above, consistently connotes "isolation." The verb "isolate" means, among other things, "to set apart from others[.]" *isolate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/isolate (last visited Dec. 13, 2021). The adjective "isolate" means "being alone." *Id.* Cherry-picking definitions does not create an ambiguity. *See Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 832 (6th Cir. 2012) ("[T]he existence of more than one dictionary definition does not make a term ambiguous."). In the face of these sources that define "quarantine" as isolation, Plaintiffs pivot to fault the district court for requiring "absolute" isolation. But the gist is not that a quarantine must impose so-called "absolute" isolation, rather that it should impose isolation, specifically, from others.

Plaintiffs' "broad" reading also contravenes common sense. *Cf. Toledo-Lucas Cty. Port Auth. v. Axa Marine & Aviation Ins. (UK), Ltd.*, 368 F.3d 524, 531 (6th Cir. 2004) ("This reading of the policy not only accords with its terms and the pertinent rules of construction but it also accords with common sense."). By Plaintiffs' logic, simply being excluded from an activity to prevent the spread of disease is an equally plausible interpretation of quarantine as isolation from others. But this interpretation would encompass a run-of-the-mill mask mandate; social-distancing requirement; or an order that closed, for example, stadiums due to the potential spread of COVID-19—all the while allowing persons to go about their daily lives unaffected. This is implausible considering the common understanding of quarantine.

We are further obligated to consider the "the term['s] ordinary meaning from other indicia, like the context of the broader policy." *Dakota Girls, LLC*, 17 F.4th at 652 (citing *Cincinnati Ins. Co. v. CPS Holdings Inc.*, 875 N.E.2d 31, 34 (Ohio 2007)). Reviewing the policy reveals the same

problems with Plaintiffs' "broad" reading. For example, the Policy provides coverage if "[y]ou are prevented" from going on vacation due to "[y]our or a Traveling Companion being . . . quarantined . . . ." Among some of the reasons listed alongside being "quarantined" is being "hijacked," "required to serve on a jury," and "subpoenaed." These events are directed specifically at the insured. Accordingly, any definition of "quarantine" that includes restraints that merely exclude persons from an area without also isolating the insured is implausible. *Cf. In re United Specialty Ins. Co. Ski Pass Ins. Litig.*, No. 20-md-02975-YGR, 2021 WL 4974981 at, \*5 (N.D. Cal. Oct. 26, 2021) ("An individual subject to any one of these conditions is compelled to stay near or within a particular area and therefore is *tethered to some location*."). Plaintiffs' "broad" reading, which would include a mask-mandate, also makes little sense in a policy that envisions a quarantine as something that could "prevent" the insured from taking a trip.

Rejecting Plaintiffs' interpretation does not end the story, however, as they still may have adequately pled they were "quarantined," as the term is ordinarily understood. On this front, Plaintiffs primarily allege the Federal Advisories and stay-at-home order required them to cancel their flight to Mexico. But assuming Plaintiffs were "prevented" from taking their vacation, this does not necessarily mean they were "quarantined"—even if failure to comply with the stay-at-home order were to result in criminal punishment. The issue is not *whether* Plaintiffs were prevented from traveling, but *how*. And at most, this allegation merely shows that the Federal Advisories and stay-at-home order excluded Plaintiffs from a single area, but not that Plaintiffs were isolated.

Plaintiffs arguably contend the Federal Advisories and stay-at-home order also had the cumulative effect of quarantining them, which then caused them to cancel their flights. Other than their flight-cancellation, however, Plaintiffs fail to allege how their daily lives were affected during

this period. Accordingly, to address this contention, we can only consider whether the stay-at-home order and Federal Advisories cumulatively imposed a "quarantine" on anyone subject to them.

The stay-at-home order began by requiring individuals to stay home to the "maximum extent possible." Or. Exec. Order No. 20-12, https://www.oregon.gov/gov/Documents/executive_orders/eo_20-12.pdf. To that end, the stay-at-home order closed campgrounds, skate parks, playgrounds, public schools, colleges, prisons, nursing homes, and specific business in which the Governor found it impossible to remain six feet apart. *Id.* Some of these businesses included amusement parks, arcades, barber shops, gyms, hair salons, museums and art galleries, ski resorts, and theatres. *Id.* At the same time, the stay-at-home order prohibited residents from patronizing these businesses. *Id.* Yet these businesses could still operate—and residents could patronize them—if they provided take-out or delivery food services and could implement social distancing requirements. *Id.* For the remaining businesses not singled out, each could remain open if remote work was infeasible and if each implemented social distancing policies. *Id.* Similarly, businesses that provided grocery, health care, pharmacy, or pet services could remain open regardless, and for grocery, health care, and pharmacy services, social distancing requirements were not required. *Id.* The stay-at-home order also provided that when people leave their homes, they should remain six feet apart, and for outdoor recreation, individuals should not engage in contact activities. *Id.* Parties and celebrations of more than twenty-five people were prohibited, and for those of fewer than twenty-five, parties and celebrations were prohibited only if attendees could not remain six feet apart. *Id.* Finally, travel was to be minimized, except for traveling from home to work, buying food and consumer goods, education

and health care, essential business and government services, and caring for family members and animals. *Id.*

Although this set of measures restrained Oregon residents from a broad range of activities and travel, the degree of restraint could not plausibly be considered an isolation from others. An ordinary person would not consider himself to be isolated from others if he could travel from home to work, clock-in for a shift at an open business, shop at an open store while remaining six feet from others, grocery-shop with impunity, pick up toilet paper at Wal-Mart, visit grandma to bring her supplies, go to the park, and surely not if he could attend a socially distanced barbeque of fewer than twenty-five people. Furthermore, the Federal Advisories only *recommended* Americans avoid foreign travel and social gatherings where people could not remain six feet apart; this did not even "restrain" Plaintiffs.

While Plaintiffs note that words evolve, we must remember that "courts are required to interpret the contract in such a way as to give effect to the intention of the parties at the time the agreement was entered into[.]" *United Nat. Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450 (6th Cir. 1999) (cleaned up). Although our discourse around public health measures has evolved since the onset of the COVID-19 pandemic, we are constrained to the meaning of quarantine as it was commonly understood when Plaintiffs purchased the Policy, i.e., before the pandemic. The term had not yet evolved into Plaintiffs' "broad" reading by this time.[1] Frankly, how could an ordinary

---

[1] Plaintiffs claim that even prior to the COVID-19 pandemic, their reading was predominate. As proof, Plaintiffs cite Webster's "Guide to Coronavirus Words," which explains that "*Quarantine* is currently most often found with the meaning of 'a restraint upon the activities or communication of persons or the transport of goods designed to prevent the spread of disease or pests.'" *A Guide to Coronavirus-Related Words*, MERRIAM-WEBSTER, https://www.merriam-webster.com/words-at-play/coronavirus-words-guide/covid-19). But surely this guide captures the common understanding of "quarantine" as it was "currently" being used during the pandemic, not prior. Most importantly, this guide merely recites the same cherry-picked definition but does not illuminate the type of "restraint" needed to impose a quarantine.

person have envisioned these actions to be a "quarantine," when such measures were relatively unheard of before the pandemic? Regardless, Plaintiffs' "broad" reading of "quarantine" as essentially a collection of compulsory and advisory governmental measures that allowed for "essential" work, "consumer" shopping, socially distanced celebrations, and only required "minimization" of travel, is simply implausible and does not create an ambiguity in an otherwise clear policy. Quarantine means, at a minimum, imposed isolation from others, and by this definition, Plaintiffs were not "quarantined" under the Policy.[2]

Plaintiffs lastly fault the district court for dismissing their breach of contract claim with prejudice. They argue the court failed to explain how an amendment would be futile or prejudicial to Nationwide. But Plaintiffs only made passing requests to amend their complaint in response to Nationwide's motion. Plaintiffs never filed a proper motion to amend, and a request for leave to amend "almost as an aside[] to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000). Despite this, Plaintiffs rely on *Newberry v. Silverman*, 789 F.3d 636 (6th Cir. 2015), where, notwithstanding a plaintiff's failure to seek leave to amend, we held "dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Id.* at 646 (cleaned up). We have addressed this misreading of *Newberry* before:

> This broad statement . . . was appropriate due to the particular facts of that case. The plaintiff in *Newberry* attached a ten-page affidavit in support of his opposition to a motion to dismiss, which contained "significantly greater detail" demonstrating a "reasonable probability" that the complaint, if amended, could withstand scrutiny

---

[2] Nationwide expends equal effort arguing that "quarantine" also must include measures directed at persons "who were or may have been exposed" to COVID-19, as opposed to the public at large. Ultimately, we need not decide this issue because the term unambiguously requires isolation from others, and Plaintiffs failed to allege they were isolated.

under Rule 9(b). The district court therefore had before it all that was needed to determine whether leave to amend was warranted.

*United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 409 (6th Cir. 2018) (internal citation omitted). Unlike the plaintiff in *Newberry*, Plaintiffs never identified below, or here for that matter, what might be pleaded to save their Complaint. We have consistently admonished litigants that "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought does not constitute a motion within the contemplation of Rule 15(a)." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) (cleaned up). "Such a request is insufficient when made before a district court and it is insufficient here." *Roycroft*, 722 F. App'x at 409 (citing *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 486). As Nationwide points out, it moved to dismiss Plaintiffs' complaint on multiple grounds, so Plaintiffs' passing request was at best ambiguous.

**AFFIRMED**.