RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES O. HENRY, PEGGY S. HENRY, MARK A.
HENRY, MARY AVIS HENRY, and CHARLES C.
HENRY,

         *Plaintiffs-Appellees*,

         *v.*

CHESAPEAKE APPALACHIA, L.L.C,

         *Defendant-Appellant.*

No. 12-4090

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00122—Edmund A. Sargus, Jr., District Judge.

Argued: April 24, 2013

Decided and Filed: January 14, 2014

Before: GIBBONS and WHITE, Circuit Judges; COHN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Daniel T. Donovan, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant. Kevin M. Pearl, FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON, Weirton, West Virginia, for Appellees. **ON BRIEF:** Daniel T. Donovan, Gregory L. Skidmore, KIRKLAND & ELLIS LLP, Washington, D.C., Stephen W. Funk, Michael R. Traven, ROETZEL & ANDRESS, Akron, Ohio, for Appellant. Kevin M. Pearl, Michael G. Simon, FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON, Weirton, West Virginia, for Appellees.

---

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

—————————

**OPINION**

—————————

HELENE N. WHITE, Circuit Judge.    Defendant-Appellant Chesapeake Appalachia, L.L.C. (Chesapeake), appeals the district court's grant of judgment on the pleadings to Plaintiffs James O. Henry, Peggy S. Henry, Mark A. Henry, Mary Avis Henry, and Charles C. Henry (Plaintiffs), in this declaratory action seeking a judgment that Chesapeake's oil and gas lease had expired.  We REVERSE and REMAND for the entry of judgment in favor of Chesapeake.

**I.**

**A.  Factual Background**

On October 17, 2006, Plaintiffs entered into an oil and gas lease with Fortuna Energy, Inc. (Fortuna), covering approximately 447 acres in Ross Township, Jefferson County, Ohio.  Fortuna assigned the lease to Chesapeake on October 18, 2010.  The lease grants Chesapeake exclusive rights to "all oil and gas and their constituents" in exchange for a rental rate of $5.00 per mineral acre per year and a royalty of 1/8th of the current market value of "all oil, gas and the constituents" produced from the property.  The lease provides for a five-year term, from October 17, 2006 to October 17, 2011, to be extended upon the occurrence of any of the following:

> (i) a well capable of producing oil and/or gas is located on the Leasehold, or on lands pooled, unitized or combined with all or a portion of the Leasehold;
>
> (ii) Lessor is receiving Royalty payments or Shut-In Royalty payments pursuant to the terms of this Lease;
>
> (iii) Operations, as hereinafter defined, are being conducted on the Leasehold, or on lands pooled, unitized or combined with all or a portion of the Leasehold, with no cessation of greater than one hundred eighty (180) consecutive days, provided that such Operations result in a well capable of producing oil and/or gas; or

(iv) the Leasehold is used, or intended to be used, for the underground storage of gas, or for the protection of stored gas[.]

The parties agree that the dispositive issue is whether "Operations" were conducted on Plaintiffs' property or "on lands pooled, unitized or combined with all or a portion" of Plaintiffs' land before October 17, 2011, so as to extend the lease term.

## B.  "Operations," Pooling, and Unitization

"Operations," as defined in the lease, include any of the following activities that occur on Plaintiffs' property or lands pooled, unitized, or combined with all or a portion of Plaintiffs' property:

(i) using bona fide good faith efforts to diligently prepare the surface of the physical well site area prior to the commencement of actual drilling activities including, but not limited to, the commencement of clearing operations on or adjacent to the well site area such as the removal of trees, the construction of access roads or the delivery of heavy equipment;

(ii) drilling, testing, completing, reworking, recompleting, deepening, sidetracking, stimulating, fracing, plugging back or repairing a well or equipment;

(iii) any acts in search for or in an endeavor to obtain, maintain or increase the production of oil and/or gas including, without limitation, injecting substances into a well;

(iv) the production of oil and/or gas;

(v) the recovery of any injected substance; or

(vi) any act or acts similar or incidental to any of the foregoing.

The lease permitted Chesapeake to "pool" or "unitize"[1] Plaintiffs' property:

---

[1]"Pooling" and "unitization" are terms of art in the oil and gas industry:

[P]ooling refers to the aggregation of two or more tracts of land into a drilling unit of prescribed size. . . . Unitization . . . refers to the combination of most, if not all, of the separate tracts in the field into one tract so that the reservoir may be operated without regard to surface property lines.

6–9 Williams & Meyers, Oil and Gas Law § 901.

>Lessee is hereby granted the right, in its sole discretion, at any time and from time to time during and after the Primary Term, to pool, unitize or combine all or any portion of the Leasehold with any other land or lands, whether contiguous or not contiguous, at any time before or after the drilling of a well so as to create one (1) or more drilling or production units. . . . For all purposes under the provisions of this Lease, the Leasehold shall be deemed to be unitized upon submission of the drilling permit application pertaining to the relevant drilling or production unit to the governmental authority having jurisdiction. . . . Any Operations conducted on the drilling or production unit, whether conducted before, after or during the exercise of the rights and powers granted under this clause, or the presence of a well capable of production located on the drilling or production unit, shall have the same effect in continuing this Lease in full force and effect as if such Operations were conducted upon the Leasehold, or as if such well capable of production was located on the Leasehold.

On June 30, 2011, Chesapeake submitted its first drilling-permit application for a well located on the property of Otilia J. Asuncion. The Asuncion well bordered, but did not include, Plaintiffs' property. Chesapeake filed a revised drilling-permit application changing the location of the well on the Asuncion property on July 19, 2011. One week later, Chesapeake filed another drilling-permit application for an Asuncion well, this time listing "landowner royalty interest holders" as part of the application. Five properties were listed, but Plaintiffs' was not among them. Chesapeake submitted additional applications on September 13, and October 7, which also did not include Plaintiffs' property.

On October 14, 2011, Chesapeake filed a "Declaration and Notice of Pooled Unit" (DPU), declaring the creation of the "Asuncion Unit." Exhibit A to the DPU listed twenty-one properties as included in the Asuncion Unit, including Plaintiffs' property. The DPU stated its effective date as October 6, 2011, and declared that "operations and/or production (or the equivalent as in the case of shut-in payments) anywhere within the Unit shall be deemed to be operations and/or production on each separate tract sufficient to extend and maintain each included lease in the Unit." The DPU specified that production from the unit would be allocated among all of the leases in the unit proportional to the surface area of each lease. On November 9, 2011,

Chesapeake submitted two more drilling-permit applications pertaining to the Asuncion Unit, and included Plaintiffs as royalty interest holders on both applications.

## II.

Plaintiffs brought this action in the Court of Common Pleas, Jefferson County, Ohio, seeking a declaration that the lease expired on October 17, 2011, and Chesapeake removed the case to the United States District Court for the Southern District of Ohio based on diversity of citizenship.  Chesapeake filed its answer, a counterclaim seeking declaratory judgment in its favor and compensatory damages for breach of contract, and a motion for judgment on the pleadings.  Plaintiffs responded with their own motion for judgment on the pleadings, which the district court granted, concluding that Chesapeake's actions did not extend the lease beyond its primary term because the lease required that a drilling permit application pertaining to the leased property or a property already unitized with the leased property, be filed before the expiration of the lease. Chesapeake timely appealed.

## III.

### A.  Standard of Review

"We review a district court's grant of judgment on the pleadings under Rule 12(c) using the same de novo standard of review applicable to orders of dismissal under Rule 12(b)(6)."  *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 240 (6th Cir. 2011).  We accept all well-pleaded material allegations of the opposing party as true, and the motion may be granted only if "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007) (internal quotation marks omitted).  "Although our decision rests primarily upon the allegations of the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (internal quotation marks and brackets omitted).  "A federal court sitting in diversity must apply the law of the highest

state court if the court has ruled on the matter in dispute; otherwise, the court may rely on case law from lower state courts." *Poplar Creek*, 636 F.3d at 240.

## B. Analysis

Under Ohio law, "contract interpretation is a question of law for determination by the court." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012). This court must determine the intent of the parties, which is presumed to reside in the contract's language. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "We must apply the plain language of the contract unless that language is ambiguous." *Textileather*, 697 F.3d at 382. "The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Karabin v. State Auto. Mut. Ins. Co.*, 462 N.E.2d 403, 406 (Ohio 1984) (internal quotation marks and citation omitted). Leases are subject to the same rules of interpretation as other written agreements. *See Myers v. E. Ohio Gas Co.*, 364 N.E.2d 1369, 1372 (Ohio 1977). "Ambiguity exists where 'the language is capable of two reasonable, but conflicting interpretations.'" *Dualite Sales & Serv., Inc. v. Moran Foods, Inc.*, 194 F. App'x 284, 288 (6th Cir. 2006) (unpublished) (citing *Wells v. Am. Elec. Power Co.*, 548 N.E.2d 995, 997 (Ohio Ct. App. 1988)). "It is generally the role of the finder of fact to resolve ambiguity." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003).

Chesapeake argues that its filing of the DPU on October 14, 2011 constituted "Operations" under the lease and that this act was sufficient to extend the period of the lease past its primary term, which would have otherwise expired on October 17, 2011. Chesapeake relies on two arguments to support this assertion: (1) filing the DPU was an "act[] . . . in an endeavor to obtain, maintain or increase the production of oil and/or gas," and (2) the filing was an act "incidental to" the "search for" or "production of" gas. Chesapeake also argues that it unitized plaintiffs' property with the Asuncion Unit by filing the DPU, and therefore under the lease, operations commenced as of the earlier filing of the drilling permit application pertaining to the Asuncion Unit. Because we agree with Chesapeake's first argument, we need not reach the second.

We look to Ohio law to determine what constitutes the commencement of operations under an oil and gas lease. In *Duffield v. Russell*, 10 Ohio C.D. 472, 19 Ohio C.C. 266 (Ohio Cir. Ct. 1899), the plaintiff argued that the defendants had not commenced operations within sixty days from the date of the lease. *Id.* at 473. On the last day of the lease, the defendants staked out a well on the land and contracted with the plaintiff's predecessor-in-interest to buy timber for the purpose of drilling the well. *Id.* The court held that the driving of a stake was sufficient to "commence" operations under the lease:

> We think there can be no question that what he did upon that day was a commencement of operations within the meaning of this contract. On general principles we would say this, because the commencement of operations upon the land for the development of oil or gas, if done honestly and *bona fide*, with the intention of developing, may consist of a trivial and insignificant matter . . . [a]ny act, the performance of which has a tendency to produce the desired result, is a commencement of operations.

*Id.* at 474. The Ohio Supreme Court affirmed without comment. *Duffield v. Russell*, 63 N.E. 1127 (Ohio 1902) (per curiam).

In *Kaszar v. Meridian Oil & Gas Enter., Inc.*, 499 N.E.2d 3 (Ohio Ct. App. 1985), Meridian leased land from the Kaszars for the purpose of oil and gas exploration. *Id.* at 4. The lease was set to expire on July 8, 1980, if Meridian did not begin operations prior to that date. *Id.* The Kaszars sought an injunction barring Meridian from further operations on their land, arguing that the lease had expired prior to Meridian's commencement of operations. *Id.* The court cited *Duffield*, holding that because Meridian surveyed the site, staked out a well, and filed documents with the SEC prior to the expiration of the lease, Meridian had commenced operations, thereby extending the lease. *Id.* at 5.

Chesapeake argues that its filing of the DPU constituted "Operations" sufficient to extend the lease. The lease defines "Operations" in relevant part as:

(iii) any acts in search for or in an endeavor to obtain, maintain or increase the production of oil and/or gas including, without limitation, injecting substances into a well;

. . . .
(vi) any act or acts similar or incidental to any of the foregoing.

Chesapeake asserts that filing the DPU constituted an act "in an endeavor to obtain . . . the production of oil and/or gas," and that the filing is also an act "incidental" to the "search" or "production" of gas. Plaintiffs argue that filing the DPU could not constitute "Operations" under the lease because the property had not yet been unitized where no permit application pertaining to Plaintiffs' property had been filed. Plaintiffs do not address whether filing the DPU constituted an act "similar or incidental" to the "search for" or "production of" natural gas.

*Kaszar* is factually distinguishable from the instant case. In *Kaszar*, in addition to filing documents with the SEC, Meridian had surveyed and staked out a well and cleared the well site. *Kaszar*, 499 N.E.2d at 4. Similarly, in *Duffield*, the lessee had staked a well, entered a contract for timber, and cut a portion of the timber for the well. *Duffield*, 10 Ohio C.D. at 474. Thus, the rule from *Duffield* that "[a]ny act, the performance of which has a tendency to produce the desired result, is a commencement of operations[,]" was announced and followed in contexts where preliminary physical activities pertaining to the property had been commenced by the lessee. *Id.* at 474.

Still, the act of filing the DPU did not occur in a vacuum; Chesapeake did not simply file a piece a paper that had no practical effect on its use of plaintiff's property. Rather, because operations had already commenced on the Asuncion unit, the filing of the DPU was an act in an endeavor to join Plaintiffs' property in the production unit that Chesapeake was in the process of exploiting. Whether the filing of the DPU had the effect of unitizing under the lease or not,[2] it was clearly an act similar to or incidental

---

[2]We have serious doubts regarding the district court's reading of the lease as requiring that a drilling permit application pertaining to the leased premises be filled as a condition of unitization. The language relied on by the court:

> For all purposes under the provisions of this Lease, the Leasehold shall be deemed to be unitized upon submission of the drilling permit application pertaining to the relevant

to acts "in search for or in an endeavor to obtain, maintain or increase the production of oil and/or gas" from the Plaintiffs' property.

We REVERSE and REMAND for entry of judgment in favor of Chesapeake.

---

drilling or production unit to the governmental authority having jurisdiction . . .

can certainly be understood as advocated by Chesapeake—that upon unitization by Chesapeake, the property is deemed to have been unitized as of date the drilling permit application pertaining to the unit was submitted so that Plaintiff receives the full benefit of all operations on the unit. In any event, because we conclude that operations commenced without regard to whether the DPU operated to unitize the property, we need not address the issue further.