NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0090n.06

No. 22-3318

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SCENICVIEW ESTATES, LLC,

     Plaintiff-Appellant,

v.

SWN PRODUCTION (OHIO), LLC; IOG
RESOURCES, LLC,

     Defendants-Appellees,

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Feb 14, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

OPINION

Before: MOORE, THAPAR, and LARSEN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** This dispute stems from an oil and gas lease executed by the parties' predecessors in interest. Scenicview Estates, LLC, alleges that the lease expired on September 19, 2017, and that the defendants have thus committed several state-law violations by continuing operations on the leasehold beyond that date. The defendants, in turn, claim that they validly pooled portions of the leasehold into a drilling unit and conducted operations on the drilling unit such that the lease extended beyond September 19, 2017, and that any activity after that date was therefore authorized under the extended lease. The district court granted the defendants' motion for summary judgment as to all claims. For the reasons that follow, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

On September 19, 2012, Sonja M. Taylor leased the oil and gas in and under her 43.919-acre property in Monroe County, Ohio, to Eclipse Resources I, LP ("Eclipse"). R. 48-3 (Lease at 1) (Page ID #1000); Schedule I (Page ID #1012). Taylor later conveyed her interest in the oil and gas in and under the property to Scenicview Estates, LLC ("Scenicview"). R. 6 (Compl. ¶ 5) (Page ID #103). The relevant portions of the lease read as follows:

> 3. LEASE TERM: This Lease shall remain in force for a primary term of five (5) years from the Lease Date (the "Primary Term"), and shall continue beyond the Primary Term (or any extension thereof) as to the entirety of the Leasehold for so long thereafter as . . . operations are conducted on the Leasehold or lands pooled or unitized therewith in search of oil, gas, or their constituents . . . .

> 4. NO AUTOMATIC TERMINATION OR FORFEITURE:
> (A) CONSTRUCTION OF LEASE: The language of this Lease shall never be read or construed as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth herein. In connection therewith, . . . the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work, including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled or unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, [and] obtaining permits and approvals associated therewith . . .).

> 14. UNITIZATION AND POOLING: Lessor grants Lessee the right to pool, unitize or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.

R. 48-3 (Lease at ¶¶ 3–4, 14) (Page ID #1000–01, 1004).  Attached to the lease as "Exhibit 'A'"

is an addendum, which modifies and adds to the terms of the lease, and reads in relevant part:

> **CONFLICT BETWEEN TERMS.**  In the event of a conflict or inconsistency between any of the terms and conditions contained in this Addendum and the other terms and conditions contained in the Lease, the terms and provisions contained in this Addendum shall be controlling.
> . . .
> **COMPLIANCE WITH LAWS:**  Lessee shall at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on the Leasehold.
> . . .
> **PUGH CLAUSE:**  In the event any pool of leases or unit is created by the Lessee . . . that encompasses lands located outside of the Leasehold with some, but not all, of lands comprising the Leasehold, this Lease shall expire upon the expiration of the Primary Term . . . insofar, but only insofar, as to any lands comprising the Leasehold that are not included in one or more of such pools or units; *provided, however*, that in the event at least 60% of the total net mineral acres comprising the Leasehold are included in one or more pools or units as of the expiration of the Primary Term or any extension thereof, this paragraph shall not apply, and this Lease shall thereafter continue in full force and effect as to the entirety of the lands within the Leasehold . . . .

*Id.* at 9, 11 (Page ID #1008, 1010).

In 2014, Eclipse pooled 19.84 acres[1] of the leased property into a drilling unit called the

Shroyer Unit.  R. 43-1 (Smith Dep. at 17) (Page ID #458); R. 48 (Defs. Mot. Summ. J. at 5) (Page

ID #976); R. 49 (Pl. Mot. Summ. J. at 3) (Page ID #1156).  It is undisputed that the lease continues

in effect as to the land in the Shroyer Unit, and it is also undisputed that the acreage included in

the Shroyer Unit is not sufficient to trigger the 60% threshold required by the Pugh Clause to

continue the lease as to the entirety of the leased lands.  R. 43-1 (Smith Dep. at 17–18) (Page ID

---

[1]According to the defendants, only 16.712 acres of the leasehold was pooled into the Shroyer Unit.  Appellee Br. at 4.  The discrepancy is unexplained but irrelevant to the determination of the claims at issue here.

#458); R. 48 (Defs. Mot. Summ. J. at 5) (Page ID #976); R. 49 (Pl. Mot. Summ. J. at 3) (Page ID #1156).

By early 2017, Eclipse had begun working on the creation of another drilling unit, the Ballpark Unit, located between the Shroyer Unit and the Switz27 Unit, which is operated by another company, CNX. R. 48-4 (Defs. Mot. Summ. J. Ex. 2) (Page ID #1013–14); R. 48-5 (Defs. Mot. Summ. J. Ex. 3) (Page ID #1015–16). Eclipse intended to drill two wells—known as Ballpark 2H and Ballpark 4H—in the Ballpark Unit, which would share a wall pad with the Shroyer Unit. R. 48-7 (Defs. Mot. Summ. J. Ex. 5) (Page ID #1019–20); R. 48-14 (Defs. Mot. Summ. J. Ex. 12) (Page ID #1062). At some point, Eclipse assigned an interest in the oil and gas produced from the Ballpark 2H and 4H wells to SEG-ECR, LLC. R. 36 (Answer to Am. Compl. at ¶¶ 36–37) (Page ID #413). SEG-ECR, LLC later assigned its interest in the wells to IOG Resources, LLC. R. 50 (Joint Mot. Voluntary Dismissal at 1) (Page ID #1368).

In the first half of 2017, Eclipse negotiated with CNX regarding the spacing of laterals—ensuring that there would be adequate spacing between the Ballpark wells and the existing Switz27 wells—and the boundaries and acreage of the Ballpark Unit. R. 48-4 (Defs. Mot. Summ. J. Ex. 2) (Page ID #1013–14); R. 48-5 (Defs. Mot. Summ. J. Ex. 3) (Page ID #1015–16); R. 48-6 (Defs. Mot. Summ. J. Ex. 4) (Page ID #1017–18). In June and July 2017, Eclipse completed legal title work, investigating title and other interest rights in the acreage proposed to be pooled into the Ballpark Unit. R. 48-9 (Defs. Mot. Summ. J. Ex. 7) (Page ID #1022); R. 48-10 (Defs. Mot. Summ. J. Ex. 8) (Page ID #1023–24). Also in July 2017, Eclipse completed preliminary cost analyses and finalized their budget for the proposed Ballpark wells, and then issued Authorizations for Expenditures ("AFEs") and sought participation from other companies in the project. R. 48-13

(Defs. Mot. Summ. J. Ex. 11) (Page ID #1045–59); R. 48-14 (Defs. Mot. Summ. J. Ex. 12) (Page ID #1060–64); R. 48-15 (Defs. Mot. Summ. J. Ex. 13) (Page ID #1065–69). At the same time, Eclipse hired Diversified Engineering to conduct basemapping and plat work on the Ballpark Unit. R. 47-1 (Lambert Dep. at 12–13) (Page ID #914). This involved fieldwork on site, as well as mapping and courthouse research to acquire deeds and surveys. *Id.* at 16–27 (Page ID #915–18). Although the fieldwork took place on the site of the proposed Ballpark Unit, it was not conducted on the portions of the unit that consisted of property leased from Scenicview, because that portion of the Ballpark Unit had already been surveyed in connection with the Shroyer Unit. *Id.* at 34 (Page ID #920).

On September 15, 2017, Eclipse filed a Declaration of Pooling and Unitization ("DPU") for the Ballpark Unit with the Monroe County Recorder's Office. R. 48-16 (Defs. Mot. Summ. J. Ex. 14) (Page ID #1070–77). The DPU purported to "pool and unitize all rights and formations covered by the Leases in the [Ballpark] Unit to the extent of [Eclipse]'s rights therein." *Id.* ¶ 4 (Page ID #1071). It described the Ballpark Unit as consisting of 220.608 acres of land, including 22.565 acres of the land leased from Scenicview. *Id.* at 6, 8 (Page ID #1075, 1077). Shortly before filing the DPU, Scenicview hired Precision Rathole to dig cellars on the Ballpark Unit. R. 46-1 (Morris Dep. at 17–18) (Page ID #799–800). Digging cellars constitutes the "first step of a drilling operation." *Id.* at 20 (Page ID #802). The cellars were dug on September 17 and 18, 2017, and the cement was poured on September 19, 2017, exactly five years after the lease took effect. *Id.* at 23–24 (Page ID #805–06).

In December 2018, Scenicview filed this action in the Monroe County Court of Common Pleas, and the defendants removed the case to the United States District Court for the Southern

District of Ohio pursuant to 28 U.S.C. §§ 1332(a), 1441. R. 1 (Notice of Removal at 1) (Page ID #1). Scenicview then filed an amended complaint, asserting eight state-law claims against the defendants based on the allegation that the lease expired on September 19, 2017, as to the portions of the leasehold not pooled into the Shroyer Unit. R. 14 (Am. Compl. at ¶¶ 1–96) (Page ID #177–91). Following discovery, the defendants moved for summary judgment on all claims, and Scenicview moved for partial summary judgment on four of their eight claims. R. 48 (Defs. Mot. Summ. J.) (Page ID #967); R. 49 (Pl. Mot. Summ. J.) (Page ID #1153). The district court granted the defendants' motion for summary judgment, finding that "Eclipse conducted operations on the Leasehold or lands pooled or unitized therewith sufficient to extend the Primary Term of the Lease beyond September 19, 2017." R. 56 (Op. & Order at 13) (Page ID #1633). Scenicview appealed. R. 58 (Notice of Appeal) (Page ID #1639).

In April 2021, Eclipse converted to SWN Production (Ohio), LLC ("SWN"), and thus we granted the parties' joint motion to voluntarily dismiss Eclipse and substitute SWN as a party. We also requested supplemental briefing pursuant to 28 U.S.C. § 1653 to confirm that we have subject-matter jurisdiction over this case. Now satisfied that complete diversity exists, we address the merits of the appeal.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). "When there is a motion for summary judgment in a diversity case, the provisions of [Federal] Rule [of Civil Procedure] 56 control its determination," because summary judgment "is a procedural device." *Reid v. Sears, Roebuck & Co.*, 790 F.2d

453, 459 (6th Cir. 1986).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  We must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  *Back*, 694 F.3d at 575 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**B.  Defendants' Motion for Summary Judgment**

"Under Ohio law, an oil and gas lease is a contract that is subject to the traditional rules of contract construction."  *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1013 (Ohio 2016).  And "contract interpretation is a question of law for determination by the court." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012).  "This court must determine the intent of the parties, which is presumed to reside in the contract's language."  *Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 912 (6th Cir. 2014).  "We must apply the plain language of the contract unless that language is ambiguous."  *Textileather*, 697 F.3d at 382. Ambiguity exists if a provision "cannot be given a 'definite legal meaning.'"  *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)).  In interpreting a contract, we must "examine the contract as a whole."  *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011).

Under the plain language of the Pugh Clause and the Lease Term Clause, if prior to September 19, 2017, (1) Eclipse validly pooled the acreage from the leasehold into the Ballpark Unit, and (2) Eclipse conducted operations, as defined by the lease, on the Ballpark Unit, the lease validly continued beyond the Primary Term as to the entirety of the leasehold, and none of

Scenicview's claims are viable. Thus, if those two conditions are met, the district court properly granted summary judgment in favor of the defendants. Scenicview argues that Eclipse did not comply with Ohio law in pooling acreage from the leasehold into the Ballpark Unit, and that therefore any operations performed by Eclipse on parts of the Ballpark Unit other than the leasehold could not have continued the lease into its Secondary Term. Appellant Br. at 14. We disagree.

### 1. Pooling the Leasehold into the Ballpark Unit

The Compliance with Laws provision of the lease requires that Eclipse comply with Ohio law relative to its operations on the leasehold, and Scenicview therefore argues that portions of the leasehold were validly pooled into the Ballpark Unit only if the pooling complied with Ohio law. According to Scenicview, this could be accomplished only by compliance with either § 1509.26 or § 1509.28 of the Ohio Revised Code. The first provision provides as follows:

> The owners of adjoining tracts may agree to pool the tracts to form a drilling unit that conforms to the minimum acreage and distance requirements of the division of oil and gas resources management under section 1509.24 or 1509.25 of the Revised Code. The agreement shall be in writing, a copy of which shall be submitted to the division with the application for a permit required by section 1509.05 of the Revised Code. Parties to the agreement shall designate one of their number as the applicant for the permit.

OHIO REV. CODE ANN. § 1509.26. The other provision, § 1509.28, involves forced pooling/unitization, which the parties agree did not occur here. Scenicview further argues that, because Eclipse did not own or control all the property included in the Ballpark Unit on September 19, 2017, Eclipse could not have validly pooled the leasehold into the Unit pursuant to § 1509.26. Appellant Br. at 18.

8

The terms of lease grant Eclipse the right to pool "all or parts of the Leasehold with other lands, whether contiguous or not contiguous, *leased or unleased, whether owned by Lessee or by others, at a time before or after drilling* to create drilling or production units either by contract right or pursuant to governmental authorization." R. 48-3 (Lease at ¶ 14) (Page ID #1004) (emphasis added). Eclipse's pooling of the leasehold into the Ballpark Unit can therefore be invalid only if it contravenes Ohio law, because the Ballpark Unit undeniably meets the criteria within the lease for pooling. Scenicview's argument fails, however, because even if § 1509.26 requires an applicant to own the entire working interest in the property to be pooled, we agree with Eclipse that § 1509.26 applies only at the point of the application for a drilling permit. As the plain language of the provision states, "[t]he [pooling] agreement shall be in writing, a copy of which shall be submitted to the division *with the application for a permit required by section 1509.05 of the Revised Code.*" OHIO REV. CODE ANN. § 1509.26 (emphasis added). The referenced code section provides that:

> No person shall drill a new well, drill an existing well any deeper, reopen a well, convert a well to any use other than its original purpose, or plug back a well to a source of supply different from the existing pool, without having a permit to do so issued by the chief of the division of oil and gas resources management, and until the original permit or a photostatic copy thereof is posted or displayed in a conspicuous and easily accessible place at the well site, with the name, current address, and telephone number of the permit holder and the telephone numbers for fire and emergency medical services maintained on the posted permit or copy. The permit or a copy shall be continuously displayed in that manner at all times during the work authorized by the permit.

OHIO REV. CODE ANN. § 1509.05.

Eclipse therefore did not contravene Ohio law, because a drilling permit was not required to conduct operations in preparation for drilling the well. Thus, Eclipse's compliance with § 1509.26 was not required under Ohio law on September 19, 2017. Given that § 1509.26 was

inapplicable at that time, the leasehold was validly pooled into the Ballpark Unit so long as it complied with the Unitization and Pooling Clause of the lease. And that Clause clearly gave Eclipse the right to pool the leasehold with property not leased or owned by Eclipse, prior to drilling—and thus prior to the period when any requirements under § 1509.26 would apply.[2]

Scenicview's reference to *Filicky v. Am. Energy-Utica, LLC*, 645 F. App'x 393 (6th Cir. 2016), does not change our analysis. The lease at issue in *Filicky* stated that the leasehold could be validly pooled only "by governmental authority or by Lessee recording in the county recorder's office a Declaration containing a description of the pooled acreage." *Id.* at 394. The lessee validly pooled the lessor's land into one unit by filing a DPU, but then subsequently failed either to reform that DPU or to submit a new DPU to validly pool the property into a second unit. *Id.* at 394–95. *Filicky* is therefore entirely distinguishable from the lease at issue here, which does not require the filing of a DPU or the completion of any other governmentally authorized process in order to pool the leasehold into a drilling unit. Eclipse therefore validly pooled the relevant portions of the leasehold into the Ballpark Unit prior to September 19, 2017.

### 2. Conducting Operations on the Ballpark Unit

Under the terms of the lease, "conducting operations in search of oil or gas" is defined as "engag[ing] in geophysical and other exploratory work, including, but not limited to, activities to drill an initial well, [or] to drill a new well . . . on the Leasehold or any lands pooled or unitized

---

[2]We recognize that § 1509.26 might also be read to apply before the point of application for a drilling permit, since it arguably also imposes obligations on the parties to the agreement at the time the agreement is made (specifically, that the agreement must be in writing). However, we see nothing in Ohio law that compels this reading of the provision, and Scenicview has not argued that Eclipse violated § 1509.26 by failing to make their pooling agreement in writing. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022) (explaining that our court generally will not review a forfeited argument).

therewith." R. 48-3 (Lease at ¶ 4(A)) (Page ID #1001). This includes, but is not limited to, "performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, [and] obtaining permits and approvals associated therewith." *Id.* Because we have determined that portions of the leasehold were validly pooled into the Ballpark Unit, the lease continued beyond its Primary Term so long as Eclipse conducted operations on any part of the Ballpark Unit, even if the operations were not on the leasehold itself.

We hold that Eclipse did conduct operations, within the meaning of the lease, on the Ballpark Unit prior to September 19, 2017, such that the lease continued beyond its Primary Term. Scenicview does not dispute that, prior to September 19, 2017, Eclipse: negotiated with CNX regarding the boundaries of and property to be included in the Ballpark Unit; investigated title and working-interests rights for property in the proposed Ballpark Unit; finalized cost analyses and budget for the Ballpark 2H and 4H wells; sent AFEs to other companies; conducted surveys of the Ballpark Unit; drafted maps of the Ballpark Unit; conducted courthouse research; filed the DPU for the Ballpark Unit; and dug cellars and poured cement in the Ballpark Unit in preparation for drilling. Appellant Br. at 24–25. Instead, Scenicview argues that, because the Ballpark Unit was not validly created under Ohio law, these activities did not constitute operations within the meaning of the lease such that they served to continue the lease beyond its Primary Term.

Scenicview does not argue that, if the Ballpark Unit was valid, as we have held, these activities could not constitute operations sufficient to extend the lease into its Secondary Term. That is likely because the plain language of the lease defines operations broadly, to include "preliminary or preparatory work necessary for drilling." R. 48-3 (Lease at ¶ 4(A)) (Page ID

11

#1001). And Eclipse presented uncontroverted testimony that digging cellars constitutes the "first step of a drilling operation" and is necessary for the commencement of drilling operations. R. 46-1 (Morris Dep. at 20) (Page ID #802). Thus, the digging of cellars and pouring cement alone are sufficient to constitute operations within the meaning of the lease so as to extend the lease into its Secondary Term. This reading is also consistent with Ohio law, which construes the commencement of operations under an oil and gas lease broadly. *See Henry*, 739 F.3d at 913 (collecting cases). Indeed, Ohio courts have held that:

> [T]he commencement of operations upon the land for the development of oil or gas, if done honestly and *bona fide*, with the intention of developing, may consist of a trivial and comparatively insignificant matter . . . . Any act, the performance of which has a tendency to produce the desired result, is a commencement of operations.

*Duffield v. Russell*, 10 Ohio Cir. Dec. 472, 474 (Ohio Cir. Ct. 1899). Eclipse's activities certainly satisfied this broad standard.

Finally, our interpretation of both pooling and operations is bolstered by the Construction of Lease clause, which provides that the "Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease." R. 48-3 (Lease at ¶ 4(A)) (Page ID #1001). As we have noted, in interpreting a contract, we "must determine the intent of the parties, which is presumed to reside in the contract's language." *Henry*, 739 F.3d at 912. This clause plainly demonstrates that, in the event of ambiguity, the intent of the parties was that the lease should continue. Because the contract is most reasonably read as continuing the lease beyond its Primary Term, and because that also reflects the intent of the parties, we hold that the lease continued in effect beyond September 19, 2017. Scenicview's claims therefore must fail.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of the defendants' motion for summary judgment.